TüRXEy, J.
delivered the opinion of the court.
Wm. Wright departed this life in the county of Montgomery, in the year 1840, having previously made and published his last will and testament, by which he directed his executor, N. H. Allen, to sell his mill with the appurtenances, and all and every species of property found in his possession at his death, and not otherwise disposed of; and gives one-fourth part of the proceeds arising therefrom to the Tennessee Annual Conference of the Methodist Episcopal Church, for the benefit of institutions of learning under the superintendence of said Conference, and to the Missionary Society of the Methodist Episcopal Church, and to be otherwise disposed of as the Tennessee Annual Conference may deem best in their wisdom. This will was duly proven by the executor, at the August term, 1840, of the County Court of Montgomery, who thereupon proceeds to execute the trust reposed in him.
On the 22d day of December, 1841,'the Legislature of the State of Tennessee passed a private act, by which A. L. P. Green, John F. Hughes, George W. Dye, John B. McFerrin and James G. Henning were appointed trustees to receive the *178 donation thus made to the Tennessee Annual Conference of the Methodist Episcopal Church, and now file this bill, by the direction of said Conference and Robert R. Roberts, President of the Missionary Society of the Methodist Episcopal Church, and Senior Bishop thereof, against the executor and the heirs at law of Wm. Wright, the devisor, to have the donations bequeathed to the Tennessee Annual Conference paid to them, to be appropriated to the purposes specified in the will. To this bill the defendants file a general demurrer, which was allowed by the Chancellor, and thereupon an appeal is prosecuted to this court.
The question presented for consideration upon the demurrer is, whether the bequest is such one as can, by established principles of law, be sustained as a charitable use, the execution of which can be decreed and enforced by a Court of Chancery in the State of Tennessee.
This is the first time that questions arising out of donations for pious and charitable purposes, have been presented for the consideration of our courts. We are consequently left without the aid of previous adjudication upon the subject, except so far as to be found in the decisions of the courts of England, and in some of our sister States. We are also left without the aid of legislative enactment, and thrown altogether upon the common law, English statutes, and English exposition of them, as the sources from which our information is to be derived. The necessary consequence is, that in the attempt to adapt to our social relations, a system which has been matured by usage, by statutes, by judicial construction, in a country so different from ours in the origin and form of its government, the habits and customs of its people, the form of its religion, and its tenures of property, we are involved in much difficulty and perplexity. This difficulty is much increased by a confusion in the authorities, arising out of the conflict of power in relation thereto, as exercised by the Chancellor, on the one hand, as the representative of the King, who, as parens patries exercises an absolute control of a large class of charities, and on the other as a judicial officer, administering justice by virtue of his office, in the execution and administration of uses and trusts.
*179 The difficulty consists in ascertaining how much of the power of the Chancellor of England, upon this subject, has been devolved upon the Courts of Chancery in this State, and to what extent it is limited by the form and nature of our institutions. The difficulty has been felt in its full force, and I regret, that circumstances have prevented, on my part, as full and complete an investigation of the subject as it well deserves from its novelty and intrinsic merits. The discussion necessarily involves two propositions.
1st. What is the common and statutory law of England in relation to the question in controversy.
2d. What portions of the law, as thus fixed in England, are in force and obligatory in the State of Tennessee.
The first proposition opens a wide field of investigation, commencing with the origin of donations for pious and charitable purposes, and ending with the principles upon which they are at present recognized and protected by the Court of Chancery in England: an investigation alarming from its extent and perplexity, but necessary, absolutely necessary for the proper understanding of the questions in controversy. I do not propose to conduct it minutely, and have no hope that I shall do it with perfect accuracy; all I design or expect, is so to review the subject as to be able to approximate with a sufficient degree of certainty, to the true sources of power, out of which the jurisdiction of the Chancellor in England arises in relation to trusts of this character, and be enabled to deduce therefrom the true rule of action upon them in the State of Tennessee. Mr. Story in the 2d volume of his Treatise upon Equity Jurisprudence, sec. 1137, observes, “that it is highly probable, that the rudiments of the law of charities were derived from the civil laws.” If by this is meant, that the first evidences of the existence of an unsuccessful attempt to confine donations for pious and charitable purposes within proper bounds, and to restrain the civil and religious abuses arising out of them, is to be found in that code of jurisprudence, I see no reason to question the correctness of the observation. But if we are to understand by it, that the source of the English jurisprudence, upon the subject, is to be sought and found in the civil law, I trust I may be per *180 mitted. to doubt the correctness of the remark. The eviLs arising from an indiscriminate and reckless conveyance of property, both real and personal, to superstitious uses, were no doubt first experienced in the decline of the Roman Empire.
It is a cause of melancholy reflection to those who have looked into the history of the Church, to find at how early a period its hierarchy, forgetting the great and vital principle which had been so impressively taught them, “that the Kingdom of Christ was not of this world,” entered into a struggle in the first place for the attainment of wealth, and in the second place for the acquirement of temporal power. The new but zealous converts, imperfectly acquainted with the mild and self-denying tenets of the religion they professed, having but a very imperfect conception of the principles of action upon which they hoped for the enjoyment of that immortality of happiness promised them; ignorant of the propriety and necessity of controlling and suppressing their evil and wicked propensities, were early led into the belief, that a composition for their indulgence was to be found in dedicating to the Church their worldly wealth, which from the high estimate placed upon it by themselves, they judged, might be highly prized as an atonement for their crimes. Accordingly as Mr. Story observes, one of the earliest fruits of the Emperor Constantine’s real or pretended zeal for Christianity, was a permission to his subjects, to bequeath their property to the Church. Code. Theodos. Lib. 16, tit., 2,1,4. But this permission was soon abused to so great an extent as to induce the Emperor Valentinian to enact a mortmain law, by which it was restrained. This restraint was, however, gradually relaxed, and in the time of Justinian, it became a fixed maxim of Roman jurisprudence, that legacies to pious uses were entitled to peculiar favor, and to be deemed privileged testaments. The influence of the clergy, and the blind credulity of their followers, having been enabled to abrogate the wise policy of Valentinian, established upon the empire a system destructive alike to the prosperity of the country, and to the purity and piety of the Church.
Like causes produced like effects in the barbarian kingdoms erected upon the destruction of the Western Empire, and it is *181 to these causes, rather than to the Roman law upon the subject, that we are to look for the origin and establishment of charitable and pious donations, as I apprehend. Not a government in Europe but what was subject to the intolerable evils resulting from the system. Wealth was first sought by the clergy, for their own ease and comfort, and then for its power. In connexion with the great influence exercised by them over a rude, ignorant and seini-civilized people, it enabled them for centuries to dictate in temporal as well as spiritual affairs; to struggle and struggle successfully with the spear, as well as the mitre. In no country in Europe, was the evil felt more strongly than in England. For as observed in Shelford’s Treatise upon Mortmain, the great and increasing accumulation of property-in the hands of the monasteries and religious houses, soon after the conquest, and the consequent extension of Papal and Ecclesiastical power, in this kingdom, appear, by our historians, to have been considered in the light of national grievances. 1st. Rapin, 278: Fuller’s Hist, of the Church, book 3, 77:Prynne’s Hist. Edw. 1, 237. History informs us, that this influence, wielded by a Beckett, was able to shake Henry the 2d, one of England’s greatest monarchs, upon his throne, and that in the reign of his son, John, it came near transferring her as a province to France, and did for the time being, subject her to pontifical sway. But our ancestors were a stern people, and had great regard for feudal rights; they saw where the evil rested, and at an early period commenced hedging it in.
The first legislative enactment upon the subject, is to be found as early as 9th Henry 3d, ch. 36, re-enacted 25th Edward 1st, ch. 36, which provides, that “it shall not be lawful, from henceforth, to any, to give his lands to any religious house, and to take the same lands again, to hold of the same house. Nor shall it be lawful for any house of religion to take the lands of any, and to leave the same to him of whom he received it. If any, from henceforth, give his land to any religious house, and thereupon be convicted, the gift shall be utterly void, and the land shall accrue to the lord of the fee.” But the religious houses and the clergy, who, Lord Coke quaintly observes, ‘were to be commended, for always having of their counsel the most *182 learned men of the laws, found many ways of evading this statute, by purchasing lands bolden of themselves, by taking leases for long terms of years, and by other devices.’ Shelford on Mortmain, 6. And it was found necessary, to prevent such evasions, to enact the statute 7th Edward 1st, 2, called the statute deviris religions, by which after reciting, “that of late it had been provided, that religious men should not enter into the fees of any, without the licence and will of the chief lord* of whom such fees were holden immediately; and notwithstanding such religious men had entered, as well into their own fees as into the fees of other men, appropriating and buying them, and some times receiving them of the gift of others, whereby the services which were due of such fees, and which at the beginning were provided for the defence of the realm, were wrongfully withdrawn, and the chief lords did lose their escheats of the same, it is provided, that no person,-religious or other, whatsoever he be, that will buy or sell any lands or tenements, or under any color of gift or lease, or that will receive, by reason of any other title whatever it be, lands or tenements, or by any other craft or design will presume to appropriate to himself, under pain of forfeiture of the same, whereby such lands or tenements may come into mortmain. We have provided also, that if any person, religious or other,-do presume either by craft or design, to offend against this statute, it shall be lawful for us, or other chief lords of the fee, immediately to enter into the land so aliened, within a year from the time of the alienation, and to hold it in fee as an inheritance,” &c.
In order to evade this statute of 7th Edward 1st, the religious houses used to set up a fictitious title to the lands intended to be given or sold, and brought an action against I he tenant to recover them. The tenant by collusion made no defence, whereby judgment was given for the religious house, which then recovered the lands by sentence "of law upon a supposed superior title. And although proceedings of this kind were carried on, by a species of conventional fraud, between the religious houses and tenant of the.land, yet the judges held, that in these cases the religious communities did not appropriate such lands •per'titidumdoni vel alterius alienationis, as the statute dereligiosis *183 7th Edward 1, expressed it, and that they were not within the words, aut alio quovis modo arte vel ingenio, for as the recoveries were prosecuted in a course oflaw, they were presumed to be just, and thus originated common recoveries.
To meet this device of the ecclesiastics, the statute of 13th Edw. 1st, chap. 32, was passed, by which it was enacted that “when religious men and other ecclesiastical persons did im-plead any, and the partjr impleaded made default, whereby he ought to lose his land, forasmuch as the Justices thought hitherto, that if the party impleaded made default by collusion, that where the demandant by occasion of the statute could not obtain seisin of the land, by title of gift, or other alienation, he should now by reason of the default, and so the statute was defrauded; it was enacted, that in this case after default made, it shall be enquired by the country, whether the demandant had right in the thing demanded or not: if it was found he had right, judgment should pass for him, and he should recover seisin; and if he had no right the land should accrue to the next lord of the fee, if he demanded it within a year of the time of the inquest taken, &c.
The next expedient resorted to by the ecclesiastics, to elude the statute of mortmain, was the adoption from the Roman law, of the distinction between the possession of land, and the use or beneficial interest, by obtaining grants, not directly to, but to the use of, their religious houses, and their successors, by which they took the profits. The Clerical Chancellors, who presided at that time, assumed a power of compelling the feoffees to perform the trust which had been reposed in them; by which means the same inconvenience was soon felt by the King and Lords as would have followed from direct alienation in mortmain. Shelford on Mortmain, 16; 2 Inst. 75; 1 Saunders on Uses, 16, 17; 4 ed.
To remedy this abuse, it was enacted by the statute of 15th Richard 2d, ch. 5, “that within a limited time all those who were possessed by feoffment, or by any other means, of lands and tenements, fees, advowsons, or possession of any other kind whatever, to the use of religious people or other spiritual persons, should either regularly convey them in mortmain by the *184 license of the King and other lords, or that they should; within the time limited, sell them to some other use, under the penalty of their being forfeited,to the King and lords respectively, according to the statute da religiosis. And under the same penalty it was enacted, that from thenceforth no such purchase should be made, so that religious or other spiritual persons should enjoy the profits.
Up to this time, as Mr. Shelford observes, all the statutes of mortmain, made, relate only to ecclesiastical corporations: civil corporations began now to attract the public attention, and the same inconvenience to be felt from the appropriation of land or tenements by them as by the former. It was therefore enacted by the statute of 15th Richard 2d, ch. 5, “that the same statute should extend and be observed of all lands, tenements, fees, advowsons, and other possessions, purchased or to be purchased, to the use of guilds or fraternities;” and moreover it was assented, “because mayors, bailiffs, and commons of cities, boroughs and other towns, which have a perpetual commonalty, and others, which have offices perpetual, as people of religion; that from henceforth they shall not purchase them, and to their commons or office, upon pain contained in the statute de religiosis; and whereas others be possessed or shall hereafter purchase to their use, and they thereof take the profits, it shall be done in like manner, as is aforesaid of people of religion.”
Another device practised by eccle-siastics, was to get their villains to marry free women, who had inheritances, so that the lands might come to their hands, by the right which the lord had over the property of his villain. The commons, in the 17th year of Richard 2d, petitioned for remedy against this evil, but were answered that sufficient remedy was provided by the statute. Shelford, 182.
Only a spiritual body politic or corporate, having perpetual succession, was capable of an appropriation: the effect of which was to create a'perpetual incumbent with all the temporal rights of the benefice and cure of souls; and therefore, originally, appropriations were made to abbots, priors, deans, prebenda-ries, and such others as could perform divine service. But in progress of time, appropriations were made to orders consisting *185 of a number of persons, as deans and chapters and nuns, who could not minister the sacraments, or perform divine service; and a vicar was appointed to perform divine service, to whom a portion of the revenue was allotted, and they to whom the appropriation was made retained the principal part of the revenues, without performing any service for- it. An appropriation could not be made without the consent of the King, the Patron, and the Ordinary. The Pope was formerly considered supreme ordinary, and made appropriations without the bishop, who was only considered an inferior ordinary. To remedy this inconvenience, it was provided by the next chapter of the same statute, that in every license, for the future to be made in chancery for the appropriation of any parish church, it should be expressly provided, that the diocesan of the place should appoint, according to the value of the church, a convenient sum of money to be paid and distributed yearly of the fruits and profits of the same church by those to whom the appropriation was made, and their successors, to the poor parishioners of each church, and that the vicar should be well and sufficiently endowed. Shelford, 18; Plowden, 496 and 97.
It being found that some gifts of lands, not within the statute of mortmain, had very much increased, it was thought expedient to restrain such alienations as eqally prejudicial to the community with those in mortmain: accordingly the statute of 23d Henry 8th, ch. 10, the first act against superstitious uses, was enacted; by which it was provided, “that all assurances and trusts of lands, to the use of parish churches, chapels, churchwardens, guilds, fraternities, commonalties, companies or brotherhoods, erected and made for devotion, or by common assent of the people without any corporation, or to uses to have obits perpetual, or a continual service of a priest forever, or for sixty or eighty years, should be held to be within the mischiefs of alienations in mortmain, and to be utterly void as to such gifts as were made after the first of March in that year, for any term exceeding twenty years from the creation of such uses, and all collateral acts and assurances for evading that act are declared to be utterly void. It appears from this statute, that *186 aggregate bodies did and could take in perpetual succession, ■without being corporated.
In this attitude were the contending parties found at the time of the rupture between Henry the 8th and the Church. The cause of that quarrel and the consequences resulting from it, are too well known to need particular specification: let it suffice, that the property which had got into the religious houses and monasteries was appropriated by him to his own uses. The first statute on this subject was passed in the 27th Henry 8th, ch. 28, by which all monasteries, priories, and other religious houses of the monks, canons and nuns, which had not lands, tenements, rents, tithes, portions, and other heredita-ments, above the clear yearly value of ¿£200, together with all the possessions of such religious houses, were given to the King, his heirs and assigns, forever. The monasteries described by this act are usually called the smaller abbeys. By the second, passed 21st Henry 8th, ch. 18, “all monasteries, priories, nunneries, colleges, hospitals, houses of friars and other religious and ecclesiastical houses and places, and all their manors, lands, tenements, tithes and other hereditaments, which since the 4th day of February, in the 27th Henry 8th, had been dissolved, suppressed, renounced, relinquished, forfeited, given up, or by any other means come to the King, and all other monasteries, &c. and places, which should afterwards happen to be dissolved, suppressed, renounced, relinquished, forfeited, given up, or by any other means come to the King, and all their manors, lands, tenements, &c. and other heredit-aments were vested in the actual seisin and possession of the King, his heirs, successors, &c. forever.”
The Priory or Hospital of St. John of Jerusalem in England and another house belonging to the same order in Ireland were dissolved by the statute of 32d Henry 8th, which was passed expressly for that purpose. The statute of 37th Henry 8th, ch. 4, charged misdemeanors on the priests and governors of chantries; that of their own authority, without the assent of their donors, patrons or founders, they had let leases for life, or terms of years, of their lands, and some had suffered recoveries, levied fees, and made feoffments or other conveyances, contrary *187 to the will and purpose of their founders, to the great contempt of the royal authority; wherefore, in consideration of his Majesty’s great cost and charges, in his then wars with France and Scotland, the Parliament put him and his successors forever, in the real and actual possession of such chimtries. The reformation in England having become completely ascendant, the remaining establishments of this kind were destroyed by statute of 1st Edward 6th, ch. 14, which gave the King “all chantries, colleges and free chapels, all lands given for the finding of a priest forever, or for the maintenance of ány anniversary, obit, light or lamp, in any church or chapel or the like, all fraternities, brotherhoods and guilds, (except those for mysteries and crafts,) with all their lands and possessions.”
Thus ended this desperate struggle between the temporal powers and the church, which commenced, as we have seen, as early as the reign of Henry 3d, and was ended in the reign of Edward 6th, by a complete and triumphant prostration of a domineering and grasping hierarchy, and the establishment of a system in relation to the conveyance of lands, tenements and hereditaments in perpetuity, which is absolutely necessary to the wellbeing of society, which is still in existence in England, and which was imported by our ancestors into the province of North Carolina, and from thence into the State of Tennessee.
These statutes have not, however, been held applicable to conveyances for charitable uses and trusts, though in most respects liable to the same abuses as conveyances in mortmain, and productive of the like political and civil evils. The only apparent and rational reason why these statutes were not made to embrace such conveyances, would seem to be, that during the dominance of the church of Rome, and pending its struggle with the Kings and Parliament of England, for the right to hold lands in mortmain, conveyances for charitable purposes, as such, were very rare; because the church assumed to be the proper channel through which charities were to be distributed, and were ever ready and able to procure to itself all such conveyances. The history of the law upon this subject prior to the statute of 43 Elizabeth, ch. 4, which is emphatically called the statute of charitable uses, is extremely obscure. We have *188 seen that it has been considered as probable, that its rudiments were derived from the Roman or civil law. But, as has been observed, we see no reason for ascending to that source for its origin, when the same causes which produced the action of the emperors of eastern or Greek empires upon the subject, were in operation in full force and rigor in England. No one can doubt, that the system of charitable uses is cousin-german to that of mortmain, arising out of the same human propensities, and stimulated and encouraged by the same orders in society. In all probability, the commencement of its origin was at some period of time during the struggle between the priesthood and the lay authorities in England, in relation to lands held in mort-main, and may have been another device on the part of the clergy, to evade the statutes upon that subject. If this be so, it perhaps would have been commenced about the time of the passage of the statute of 15th Richard 2d; made to avoid conveyances in trust for the use of religions people, and it might have arisen as a substitute, and the instances not sufficiently numerous to attract public attention until 23d Henry Sth, the first statute against superstitious uses, which, as we have seen, places all assurances and trusts of land to the use of parish churches, chapels, church wardens, guilds, commonalties, companies, fraternities, or brotherhoods, erected or made for devotion, or by common consent of the people, without any corporation; or to uses to have obits perpetual, or a continual service of a priest forever, or for 60 or 80 years, were declared to be within the mischief of mortmain, and to be utterly void. Here commenced the distinction between conveyances in trust, for the use of such purposes as were charitable, and such as were superstitious, which, as we shall have occasion to see, has been ever since maintained in England, by judicial determination, and which will be productive of a strange anomaly, if attempted to be carried out in this State. But be this as it may, it is certain that few traces remain of the exercise of the jurisdiction of a court of chancery upon the subject in any shape, prior to the statute of Elizabeth. As it is probable, however, — nay almost certain, — from the wording of the statute, that the practice of executing such conveyances, originated at a period an *189 tecedent to its passage, it is also probable that they were sustained by the court of chancery in some form or other before that time, most likely by bill to enforce the performance of the trust; as we have seen that the clerical chancellors of that period had assumed a power of compelling feoffees to uses to perform the trust which had been reposed in them. But whether this be so or not, is, in our opinion, immaterial to the question in controversy in the present case: for if such relief were granted, it must have been against a trustee, and in favor of a distinct positive trust; and if this were not so, and they assumed a jurisdiction at large, upon the subject, without regard to a fixed principle of action, subject alone to the whims and caprice of the Chancellor, it would furnish no obligatory rule of action for us. Indeed, the searching into the chancery office of England at a time anterior to the reign of Elizabeth, for principles of chancery jurisdiction, as applicable to our system of government and jurisprudence, would be like looking for a live body in an Egyptian catacomb. Mr. Story, in his treatise upon Equity Jurisprudence, §1143, says: The principal, if not the only cases now tobe found previous to the statute of Elizabeth, were decided in the courts of common law, and turned upon the question, whether the uses were void or not within the statute against superstitious uses. One of the earliest cases is Porter’s case, 1 Coke, 22, which was a devise of lands, devisable by custom to the testator’s wife in fee, upon condition that she should assure the lands devised for the maintenance and continuance of a free school, and certain almsmen and alms-women; and it appeared, that the heir had entered for condition broken and conveyed the same lands to the Queen. It was held, that use being for charity, was a good and lawful use, and not void by the statutes, against superstitious uses. Lord Eldon, in commenting upon this case, in the Attorney General vs. Bowyer, 3 Vesey, 726, observes: It does not appear that a court of chancery at that period had cognizance upon information for the establishment of charities. Prior to the time of Lord Eles-mere, as far as the tradition of the times immediately following goes, there were no such informations as that upon which I am now writing, (viz, an information to establish a charity,) but they *190 made out their cases, as well as they could, by law. So that the result of Lord Eldon’s researches on this point is, (as Mr. Story observes,) “that until about the period of enacting the statute of Elizabeth, bills were not filed in chancery to establish charities. , And it is remarkable, that Sir Thomas Egerton and Lord Coke, who argued Porter’s case for the Queen, though they recited many antecedent cases, refer to none which were not decided at law.”
Mr. Story further observes in this connexion: “The absence, therefore, of all authority derived from equity decisions, on an occasion where they would probably have been used, if any existed, certainly does very much favor the conclusion of Lord Eldon. If we might hazard a conjecture, it would be, that Porter’s case, having established, that charitable uses, not superstitious, were good at law, the court of chancery, in analogy to cases of other trusts, immediately held the feoffees to such uses, accountable in equity for the due execution of them; and that the inconvenience felt in resorting to this new and anomalous proceeding, from the indefinite nature of some of the uses, gave rise within a very few years to the statute of 43d Elizabeth, ch. 4.”
But be this as it may, (and in our opinion, as before observed, it is a question of little or no importance in the consideration of this case,) it is certain that, under the statute of Elizabeth, the jurisdiction of the Chancellor was greatly enlarged, either by the operation of the statute, or what is more probable, by an assumption of power hitherto unknown in that court, and based uponthat statute, by construction, whether well or ill founded, as Mr. Story observes, is now of no consequence. For, as he again observes, “bills to establish charitable uses might have been introduced by Lord Elesmere about five years before the statute of Elizabeth, which were sustained against feoffees for charitable uses, but not where the donation was to charity generally and no trust estate was interposed, and no legal estate devised, to support the uses; as it is very certain, that at law devises to charitable uses generally, without interposing a trustee, and devises to non-existing corporations, or to an unincorporated society, would have been, and in fact were, held utter *191 ly void, for want of aperson having a sufficient capacity to take as devisee.”
The statute of Elizabeth cured this defect, and provided a new mode of enforcing such uses, by a commission under the direction of a court of chancerjn This brings us to the examination of that statute, and the discussion of the principles introduced by, and the practice under it. This statute, after reciting “that lands, rents, annuities, hereditaments, goods, chattels and stocks of money, had been given and appointed, for various charitable uses, therein enumerated, viz, relief of aged, impotent and poor people, maintenance of sick and maimed soldiers and marines, schools of learning, free schools and scholars in universities, for repair of bridges, ports, havens, causeways, chui'ches, sea banks and highways, for education and preferment of orphans, for or towards relief, stock, or maintenance, for houses of correction, for the marriage of poor maids, for supportation and help of young tradesmen, hadicraftsmen, and persons decayed, for relief or redemption of prisoners or captives, and for aid and ease of any poor inhabitants concerning payments of fifteenths, setting out soldiers and other taxes; which had not been employed according to the charitable intent of the giver and founder thereof, by reason of frauds, breaches of trust, and negligence in those who should pay, deliver and employ the same;” enabled the Lord Chancellor or Keeper of the Great Seal of England, for the time being, “to award commissions into all or any of the parts of the realm respectively, to the bishop of every civil diocese, and his chancellor and other persons, authorizing them, or any four or more of them, to enquire, by a jury of the country and by other means, of all gifts, limitations, assignments and appointments aforesaid; and of the abuses, breaches of trust, negligences, misemployments, not employing, concealing, misconceiving or misgovernment, of any lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money or stocks of money, theretofore or thereafter to be given, limited, appointed oras-signed, for any of the charitable and goodly uses before rehearsed; and after the commissioners, or any four of them, upon calling the parties interested, should make enquiry, by the *192 oaths of twelve or more men of the county, who might be challenged by the parties interested, and upon such enquiry set down such orders, judgments and decrees, in order that the charitable gifts might duly and faithfully be employed for the charitable purposes for which they were given by the donor thereof: which orders, judgments and decrees, not being contrary to the orders, statutes or decrees of the donors or founders, should stand firm and good, according to the tenor thereof, and be executed accordingly; until the same should be undone or altered by the Lord Chancellor, or Lord Keeper of the Great Seal, upon the complaint of any party aggrieved, to be made to him.” Now the first thing that strikes us on reading this statute, is, that upon its face it is wholly remedial, not intended to enlarge the jurisdiction of the court, upon the subject matter; not intended to introduce any new rule of action thereon, in relation to the rights to be acquired under donations or devises for charitable uses, but only to authorize and require the chancellor to adopt a new remedy for the preservation and enforcement of such donations, by a commission, under the provisions of the statute. It is not, then, surprising, that shortly after the passage of the statute it became a matter of doubt, whether the court of chancery could grant relief by original bill, in cases within the statute, or whether the remedy was not confined to proceedings by commission. This doubt remained till the case of Attorney General vs. Newman, 1 Chancery Cases, 157, in the reign of Charles the 2d, when it was settled in favor of the jurisdiction of the court by original bill. The consequence of this decision, and the practice under it, has caused the power given by the statute, (to wit, the appointment of a commission,) to fall into disuse, and the chancellor assuming to do by original bill what was designed by the statute to be done by commission, a course of practice novel and complicated in its character, has been introduced into the chancery court, difficult of comprehension by American lawyers, and one almost impossible to shape to American use. In the examination of the nature and extent of this jurisdiction of the chancellor as established by construction under the statute of Elizabeth, the first thing necessary to consider is, what gifts come under the *193 denomination of charitable uses, in contradistinction to superstitious uses which are not within the statute. As to what are considered charitable gifts, it is sufficient for the present purposes to say, that the statute has received an equitable construction, and many things which may be classed ejusdem generis, besides those specified in the statute, have been held to be charities, within its meaning and purview; but it becomes for us much more important to enquire, what things are considered to be superstitious uses, and not within the protection of the statute. And we find that a superstitious use is defined to be, where any manors, lands, tenements, rents, annuities, profits, hereditaments, goods or chattels, are given, received or appointed, for and towards the maintenance of a priest to say mass; for the maintenance of a priest or other man, to pray for the soul of any dead man, in such a church or elsewhere, or to maintain perpetual obits, lamps, torches, &c. to be used at certain times, to save the souls of men out of purgatory; or to maintain an anniversary or obit, or any light or lamp, in any church or chapel, or any like. Gifts for the following purposes are decided to be superstitious: For the good of the soul or for praying for the soul of the testator, or for the dead, whether in or out of a chapel or church, or for the maintenance of popish priests; for finding priest or obit, even for eight years; for hiring a priest to say mass for the souls of the feoffor or his friends. So to find, support and maintain forevermore, a taper of wax of a pound weight, to stand and burn before the image of our Lady, in the chancel of a parish church, at all divine service to be done and said within the same church, in the honor of our God and Lady and all saints, — is a superstitious use.
In the case of Doe dem. Willard vs. Hawthorn, 2 Barnwell & Alderson, 96, Lord Tenterden seems to have been of opinion, that a trust for supporting a chapel, for a congregation of pro- ■ testants assembling under the patronage of Lady Huntingdon’s college, was a superstitious use within the statute of Henry 8th, ch. 10. So is a legacy for such purposes as the superior of a convent or his successor, should judge most expedient. So is a bequest of legacies to Roman Catholic establishments *194 in foreign countries, and the kingdom of Great Britain, and many others too tedious to mention, of a like character, but which may be seen upon inspection of the 3rd section of Shel-ford’s Treatise on Mortmain, page 89.
There is also a class of cases, in which uses and trusts are neither charitable nor superstitious. A general direction by a testator to apply property for benevolent purposes, or to such objects of benevolence and liberality, as the executor in his own discretion shall most approve of, or in private charity, or for charitable and public uses in general and undefined terms, without naming any specific object, have been held not to create charitable uses. Thus where the testatrix bequeathed all her personal estate to the Bishop of Durham, his executors, &c. upon trust, to pay her debts and legacies, and to dispose of the ultimate residue to such objects of benevolence and liberality, as the Bishop of Durham in his own discretion shall most approve of, — it was said the residue could not be held to be given to charitable purposes; and as the trust was too indefinite to authorize an application to any other purpose, it followed that the residue remained undisposed of, and to be distributed among the next of kin to the testatrix. 9 Vesey, 399.
So when a testator, after the decease of his wife, gave lands to trustees and their heirs upon trust to pay certain legacies', with a power to sell or mortgage, and proceeded thus: “The surplus or reversion of said messuage, &c. and premises, after my said debts and legacies are so discharged, to be applied to the said trustees and the officiating ministers of the congregation: or assembly of the people called Methodists, that now usually or that shall for the time being assemble at Longford in Fbleshill, as they shall from time to time think fit to apply the same. To which purpose I will and devise, that when any two or more of my said trustees shall die, the survivors or survivor shall, from time to time, nominate or appoint others.” Lord Elenborough, 0. J. said, that it was nothing like a devise to charitable uses, for the trustees might apply the estate to any use they thought fit, the will not aiming to confine them to apply it to charitable uses, although it might be supposed that the *195 testator meant them to apply it to fanatical and superstitious uses. Yet it was left to their caprice. 6 East, 328.
So a bequest to three persons and their executors and administrators, “in trust, to be by them applied and disposed of for and to such benevolent purposes as they in their integrity and discretion may unanimously agree on,” was held not to amount to a charitable use. James vs. Allen, 3 Mer. 17.
In order to create a charitable use, the general principle is, that the trust must be of such a tangible nature, that the court can deal with it: when it is mixed up with general moral duty, it is not the subject of the jurisdiction of a court of chancery. Shelford on Mortmain, 85.
A devise of money to be given in private charity, was held not to be sufficiently definite to give the crown jurisdiction, or to enable the court to execute the trust. Ommanney vs. Butcher, Tur. & Russ. 260.
A great many other cases of like character may be found in the 2nd section of Shelford on Mortmain, 83. These are sufficient for the purposes for which .they were designed. The charitable use under the statute, being in existence, and the power of the chancellor in England -to protect and enforce it being granted, the next subject of enquiry is, how this power is exercised. His jurisdiction upon the subject seems to be derived from three sources: 1st, As a representative of the crown: 2nd, Under the statute of Elizabeth, which is personal, and not exercised in virtue of his ordinary or extraordinary jurisdiction: and 3rd, As a judge exercising inherent power in the execution and administration of uses and trusts, under the extraordinary jurisdiction of the court. These three branches of jurisdiction embrace every ease of charitable donation, cognizable before the chancellor.
Mr. Maddox, in his treatise upon the principles and practice of the High Court of Chancery in England, says, in book 1st, page 1: All matters determinable in the Court of Chancery, may be classed under the one or the other of the following heads: 1st, The common law jurisdiction; 2nd, The equity jurisdiction; 3rd, The statutory- jurisdiction, and 4th, The specially delegated jurisdiction. The first and second are fre *196 quently called the ordinary and the extraordinary jurisdiction. The first, the common law, or ordinary jurisdiction, invested the chancellor with various powers, which are not required to be minutely investigated, in the case under consideration, as the administration of uses for charitable purposes, does not arise under it, in any of the phases in which it is presented: let it suffice, that under it he is a privy councellor, and prolo-cutor of the House of Lords, as well as the patron of the King’s livings, under the value of twenty marks per annum: that he is also a conservator of the peace, and may award precepts and take recognizances for the peace; that Parliament is summoned by writs issued by him, and that all acts of Parliament are enrolled and kept in his office: such other parts of his common law jurisdiction, as have been made the subject of consideration in the Court of Chancery, are principally of three kinds: 1st, The nomination, &c. of officers of the court; 2d, Proceedings in the Petty Bag office; 3rd, The ordering of writs to be made out by the cursitors. The extraordinary jurisdiction of the Court of Chancery distinct from the courts of law, is, as Mr. Cooper, in his work upon Equity, page 23, says, certainly a peculiarity in the jurisprudence of the country — though the distinction between law and equity has heretofore been familiar with all nations, both ancient and modern, — “The precise lime, however, when this separation took place, and the means by which it was effectuated, are points of some difficulty, at this distance of time, to ascertain.” “No mention is made in Granville, Bracton, or in any of our judicial classics, of a court of equity; which furnishes the most decisive evidence of its non-existence, when the treatises were compiled.” The first register book, or book of minutes, or orders, made in the Court of Chancery, is of Easter term, 36th Henry 8th: in none of our books of cases is any to be found there determined till the 37th Henry 6th, except only on the subject of uses; and our great antiquarian Lambert, who was a master in chancery, and keeper of the records in the Tower, found no proceeding whatever, before the 20th of Henry the 4th, when on account of the troubles of the times, feoffments to uses, began. But, nevertheless, it is beyond a doubt, that the court exercised its equi *197 table jurisdiction in the reign of Richard the 2nd; and it has been the generally received opinion, that the equitable jurisdiction began even so early as the reign of Edward the 3rd. If the origin of this jurisdiction is to be traced to uses and trusts, this is most probable. We have seen that one of the expedients of the ecclesiastics, to elude the statutes of mortmain, was the adoption from the Roman law, of the distinction between the possession of land and the use or beneficial interest, by obtaining grants, not directly to, but to the use of, their religious houses, and their successors, by which they took the profits; and that the clerical chancellors, who presided at the time, assumed the power of compelling the feoffees to perform the trust; and that to remedy this evil the statute of the 15th Richard 2nd was passed. Now, it is very probable, that this practice of the ecclesiastics had been in use several years before it was found necessary to provide against it; and this may well have thrown the decisions of the chancellor, upon the subject, back into the reign of Edward 3rd, the immediate predecessor of Richard 2nd; and it is also highly probable, that the use of conveyances in trust, which became very common between laymen during the struggles which commenced between Henry 4th and Richard 2nd, and ended with the death of Richard 3rd, may have been adopted, from the practice of the ecclesiastics, previous to the passage of the act of 15th Richard 2nd; and that the decisions which had commenced upon ecclesiastical trusts were continued and increased upon lay trusts, until they produced the passage of the statute of 27th Henry the 8th, which struck at the evil, by transferring the possession to the use. But, as has been before observed, it is a matter of very little importance, when this jurisdiction commenced: the principles upon which it was exercised were well fixed; the proceeding was against a feoffee or trustee to uses, and these uses must have been such as were not against the law; and therefore Mr. Story, as we have seen, observes, “that it is very certain that at law devises to charitable uses generally, without interposing a trustee, and devises to a non-existing corporation, or to an unincorporated society, were held utterly void, for the want of a person having sufficient capacity to take as a devisee: *198 and also that bills for the enforcing donations, where the charity was general, were not sustained,'where there was no trust estate devised to support the uses.
I therefore think that we may safely assume, that the power of the chancellor to decree an execution of a trust for charitable purposes so far as it arises out of his extraordinary jurisdiction, rests upon the same principles as trusts of every other kind and description, and that there must be either a cestui que trust, having sufficient legal capacity to take as devisee, or do-nee, or that there must be a feoffee or trustee, charged with a specific and legal trust, before the jurisdiction can be exercised. The jurisdiction of the chancellor as exercised upon this subject, by the construction of the statute of Elizabeth, and by delegation, is essentially different from that exercised by him under the extraordinary jurisdiction of the court, and is either by virtue of the sign manual of the King, or information by original bill, to which the Attorney General; as representative of the King, is necessarily a party. It becomes necessary to investigate the nature of the King’s power upon this subject, with the view of ascertaining the extent to which it goes, and when it may be exercised by virtue of his sign manual, and when by information by the Attorney General.
Mr. Shelford, in his Treatise upon Mortmain, 268, says: “The protection of several interests is vested in the crown as Parens Patrice, as in the case of charities, infants and lunatics. It is said, that the King, as Parens Patrice, has a superintending power over all charities, abstracted from and antecedent to the statute of 43rd Elizabeth, ch. 4, which paternal care and protection is delegated to thé court of chancery; and therefore, when persons, who are named as trustees to charities, fail in the performance of their duties, either by death or disability, or refusal to act, the constitution has provided a trustee in the person of the King.”
Sir William Blackstone, in the third volume of his Commentaries, 427, observes, that the King, as Parens Patrice, has the general superintendence of all charities, which he now exercises by the keeper of his conscience; and therefore, whenever it is necessary, the Attorney General,-at the relation of some *199 informant, who is usually called the relator, files, ex officio, an information in the Court of Chancery, to have the charity properly established. This proposition, however, is too general, as has been observed. For, though it be true, that where a charity is established, and there is no charter to regulate it, (as there must be some power to regulate,) "the King has in that case a general jurisdiction; yet if there be a charter, with proper powers, the charity must be regulated in a manner prescribed by the charter, and there is no ground for the controlling influence of the Court of Chancery. 1 Vesey, Sen. 328; 2 Fonb. Eq. 208, n.
Mr. Shelford again observes, same work, page 269: “The principal, originally the whole, jurisdiction,'of a court of equity, was the administration of trusts, by protecting not only the visible owner, who alone can proceed at law, but the individual equitably, though not legally, entitled. From that principle arose the practice of administering the trusts of a public charity. Persons possessed of funds appropriated to such purposes, are within the general rule: but no one being entitled by an immediate and peculiar interest, to prefer a complaint for compelling the performance of the obligations of trustees, and to enforce their responsibility, it is the duty of the Crown, as Parens Patrice, to protect property devoted to charitable uses, and that duty is executed by the officer who represents the Crown for all forensic purposes; and on that foundation rests the right of the Attorney General in such cases to obtain by information the interposition of a court of equity.
In the case of Wellbeloved vs. Jones, 1 Sim. & Stew. 40, it was held that the Attorney General is a necessary party to all suits for charitable funds, except where a legacy is given to the officer of an established institution as part of its general funds; and that when a legacy is given for permanent charitable purposes to persons having no corporate character, the court will not, without a reference to the Master, allow the fund to be paid over to those persons, even when they are intrusted by the testator with the management of the fund. The Vice Chancellor said, “The Attorney General must be made a party, because the King, as Parens Patrice, superintends the adminis *200 tration of all charities, and acts by the Attorney General, who is his proper officer in this respect. It has not been hel<J necessary that the Attorney General should be a party, where a legacy has been given to a treasurer or other officer of some established institution: and this exception is reasonable; for the Attorney General can have no interference with the distribution of its general funds. The court will never permit this legacy to come into the hands of the plaintiffs, who now happen to fill the particular offices in this society; but will take care to secure the objects of the testator by the creation of a proper and permanent trust; and upon the hearing, will send the cause to the Master for that purpose, and it will be one of the duties of the Attorney General to attend the Master on that subject.”
Lord Redesdale, in the case of The Corporation of Ludlow vs. Greenhouse, 1 Bligh.N. S. 48, said, “That the ground stated in all the books is this, that the King is to be considered as the Parens Patrice; that he is the protector of every part of his subjects; and that therefore it is the duty of his officer, the Attorney General, to see that justice is done to every part of those subjects. It would be highly improper for the Attorney General, assisting in that character, to press harder upon one party than on another. It is his duty to see that justice is done, and it was for that purpose that informations in the name of the Attorney General were presented, for the purpose of carrying into execution charitable dispositions, or for providing for the due distribution of charitable funds. Relators were required, because the Crown paid no cost. The Attorney General, prosecuting as the officer of the Crown, could not be liable for costs, and a complaint might be made highly oppressive, unless there were some persons responsible for the cost that might be incurred in consequence of the proceeding.”
It was established by three early cases, viz, Attorney General vs. Siderfin, 1 Vernon, 224, Attorney General vs. Matthews, 2 Lev. 167, Clifford vs. Francis, Freem. 320, “that when property was not vested in trustees, and the gift was to a charity generally, not to be ascertained by the act of the individuals referred to, the charity was to be disposed of, or a bill to be preferred in the Attorney General’s name, not by a scheme *201 before tbe Master, but by the King, the disposer of such charities, in his character of Parens Patrice.’’ In the case of Mogridge vs. Thackwell, 7 Vesey, 83, Lord Eldon observed, “It is established, that where money is given to charity generally and indefinitely, without trustees or objects selected, the King, as Parens Patrice, is the constitutional trustee:” and the result of an elaborate investigation of all the authorities, by that learned judge, in that case, was, that “the general principle most reconcilable to the cases, is, that where there is a general, indefinite purpose of charity, not fixing itself upon any object, the disposition is in the King by sign manual; but that where the execution is to be by trustees, with general or some objects pointed out, the court will take the administration of the trust.” And in a subsequent case, Pierce vs. Archbishop of Canterbury, 14 Yesey, 372, his Lordship observed, “that the distinction which he observed in the case last cited, was, that where the bequest is to trustees for charitable purposes, the disposition must be the subject of a scheme before the Master; but where the object is charity, without a trust interposed, it must be by sign manual.” That is, in the one case the relief is by original bill, upon the information of the Attorney General, and in the other upon the sign manual of the King.
Mr. Story, in his work upon Equity Jurisprudence, §1190, says: “The general doctrine in England is, that the King, as Parens Patrice, has a right to guard and enforce all charities of a public nature, by virtue of his general superintending power over the public interest, where no person is intrusted with that right.
Whenever, therefore, money is given to charity, generally and indefinitely, without any trustees pointed out, who are to administer it, there does not seem to be any difficulty in considering it a personal trust devolved upon the King as the constitutional trustee, to be administered by him, through the only proper functionary known to that government, viz, the Lord Chancellor, who is emphatically, for all public purposes of this sort, styled the keeper of his conscience. In such case it is not ordinarily important whether- the Chancellor acts as the special delegate of the Crown, or the King acts under his *202 sign manual, through his Chancellor guiding his discretion. In practice, however, it has been found very difficult to distinguish in what cases the one or the other course ought, upon strict principles of prerogative, to be adopted. For where money has been given to trustees, for charity generally, without any objects specified, the charity has been sometimes administered by the King under his sign manual and sometimes by the Court of Chancery.” The author then refers to the principle, as extracted from an examination of the cases, by Lord Elden, before referred to, and recognizes it.
The question is, however, of very little importance, for the case now under consideration. All the authorities, and all the comments thereon, clearly establish the position, that, be" it by the one or be it by the other, it is a prerogative exercise of power: in the one case by the King himself in person, by virtue of his sign manual, and in the other by the Chancellor, by virtue of the prerogative delegated to him, and upon information received through the Attorney General.
Mr. Story, in §1188 of his work upon Equity Jurisprudence, says: “The jurisdiction exercised by the Chancellor under the statute of 43 Elizabeth, ch. 4, over charitable uses, is held to be personal in him and not exercised in virtue of his ordinary or extraordinary jurisdiction in chancery, and in this respect resembles the jurisdiction exercised by him in the cases of idiots and lunatics, which is exercised purely as the delegate of the Crown. 3 Blacks. Com. 427, 428.
Mr. Maddox, in his work upon Chancery, 2nd vol. 721, says: “The administration of idiots and lunatics by the Chancellor,, is in virtue of personal authority given by the Crown.” 2 Atkins, 553; 19 Vesey, 122.
Mr. Story, in §1191 of the same book we have so frequently quoted, observes: “But when a charity is definite in its objects, and lawful in its creation, and is to be executed and regulated by trustees, whether they are private individuals or a corporation, then the administration properly belongs to such trustees: the King, as Parens Patrice, has no general authority to regulate or control the administration of the funds.” The same author also says, in §1141, that “the construction of char *203 itable uses, in former times, was pushed to the most alarming extravagance. And although it has been in a great measure checked, in later and more enlightened times, there are still some anomalies in the law upon the subject, which are hardly reconcilable with any sound principles of judicial interpretation, or with any proper exercise of judicial authority.”
As has been heretofore observed, the conveying of lands to charitable uses is certainly liable, in many respects, to the same objections and the same abuses, as conveyances in mortmain: accordingly we find that the statute of 9th George 2nd, ch. 26, has been passed upon the subject, not indeed prohibiting such conveyances, but restraining them.' This statute, after reciting “that gifts or alienations of lands in mortmain were prohibited by Magna Charla, and other wholesome laws, as prejudicial to the common utility, and that such public mischief had greatly increased, by many large and improvident dispositions, made by languishing or dying persons to charitable uses, to take place after their deaths, to the disherison of their lawful heirs, enacts, that after the 24th day of June, 1736, no lands or heredita-ments whatsoever, nor any sums of money, or an}r other personal estate whatsoever, to be laid out or disposed of, in the purchase of any lands or hereditaments, should be given, or in any other way conveyed to, any person or persons, body politic or corporate or otherwise, for any estate or interest whatsoever, or any ways charged or encumbered, by any person or persons whatever, in trust or for the benefit of any charitable use whatever; unless such gift or conveyance of any such lands or here-ditaments, sums of money or personal estate, (other than stocks in the public funds,) be made by deed executed in the presence of any two or more creditable witnesses, twelve calendar months before the death of such donor or grantor, and be enrolled in the Court of Chancery within six months next after the execution thereof; and unless the same be made to take effect in possession, for the charitable use intended, immediately from the making thereof, and be without any power of revocation, reservation, trust, condition, limitation, or agreement whatsoever, for the benefit of the donor or grantor, or of any person claiming under them: and declares all gifts, grants, *204 conveyances, appointments, transfers, and settlements, whatsoever, of any land or other hereditaments, or of any estate or interest therein, or any charge or incumbrance, affecting any lands or hereditaments, or of any stock money or other personal estate, or securities for money, to be laid out or disposed of in the purchase of any lands or hereditaments, or of any estate or interest therein, or of any charge or incumbrance thereon, to, or in trust for, any charitable use, made in any other manner or form, than by the act directed, to be absolutely and to all intents and purposes null and void.
Although this statute contains no express words prohibiting a bequest of money, to be produeéd by the sale' of lands, for charitable purposes, yet it is settled by construction, that such bequest is within the spirit and meaning of the law. Thus where a testator devises all his real estate to his executors, in trust, to sell, and after the payment of certain legacies bequeathed, the money to arise by the sale of his real estate, and the intermediate rents, and all his personal estate, to his executors in trust, to pay one moiety, to the Governor of Bethlehem Hospital, for the support and benefit of the incurable lunatics, and the other half to the Treasurer of St. George’s Hospital, to be applied in carrying into effect the designs of that Hospital. The case was held to be clearly within the act, which prevents both the conveyance of land, and the charging of land for charitable purposes. Ambl. 20 — See also 2 Vesey, Sen., 52: Shel-ford on Mort. 165. Such it seems to me is the common and statute law of England upon the subject of charitable uses.
Let us endeavor to reduce it to a few general propositions, so far as it is applicable to the present case.
Devises or donations to charitable purposes, are not within the operation of the statutes of Mortmain. If the charity be created either by devise or deed, it must be in favor of a person having sufficient capacity to take as devisee or donee, or if it be not to such person, it must be definite in its object, and lawful in its creation, and to be executed and regulated by trustees, before the Court of Chancery can, by virtue of its extraordinary jurisdiction, interfere in its execution. All charities, not supported by trustees, (unless in favor of an individual *205 or a corporation, having power to implead and be impleaded,) if of a general indefinite purpose, are administered by the Chancellor under the sign manual of the King. All charities supported by trustees, with general objects, or some particular object pointed out, are administered by the Chancellor by original bill, upon information of the Attorney General, who acts for and in behalf of the King, and is a party thereto, and the jurisdiction in the two latter class of cases, arises out of delegated prerogative. And finally, that no gift, grant, conveyance, appointment, transfers or settlements of any lands or other hereditaments, or any moneys or other things arising out of them, is good and valid in law or equity, unless made twelve months before the death of the donor or grantor, and registered in the Chancery Court within six months thereafter.
The second proposition to be discussed is, what portions of the law, as thus fixed in England, are in force and obligatory in the State of Tennessee.
The 1st Statute (and the only one necessary to be examined for the present purpose) establishing and defining the jurisdiction of the Court of Chancery in North Carolina, was passed in 1782, ch. 11. After the preamble, that courts of law, as at present established, are not equal to the redress of all kinds of injuries, but many innocent men are withheld from their just rights, and some deprived of them altogether, for want of a Court or Courts of Equity, it provides, “That from and after the present session of the General Assembly, each Superior Court of law in this State, shall also be made and act as a Court of Equity for the same district, and possess all the power and authority within the same, that the Court of Chancery, which was formerly held in this State under the late Government, used and exercised, and that are properly and rightfully incident to such a court, agreeable to the laws in force in this State, and not inconsistent with our present constitution.”
What were the powers and authorities used and exercised by the Court of Chancery, held in the Colonial Government of the Province of North Carolina, we have now no means of ascertaining. The probability is, that they did not embrace, either the ordinary jurisdiction of the Chancellor in England, *206 or that arising from a delegation of the jjrerogitavce regis, inasmuch as the exercise of these branches of jurisdiction in England arose out of the peculiar relation which existed between the Chancellor and King, fixed by long usage and custom, and in connexion with a state of affairs, which could not have existed between a Court of Chancery and the lords proprietors and governors of N. Carolina. But be this as it may, the restriction in the act of 1782, that the jurisdiction is not to be inconsistent with the Constitution of the State, necessarily cuts off both these sources; because upon the successful event of the revolution, our whole form of government changed, and there ceased to be any branch of executive prerogative, in relation to the administration of justice, to be delegated to a Chancellor, and also the whole system out of which his common law power arose was thoroughly prostrated. I, therefore, think it may be well assumed, that by a fair and legal construction of the act of 1782, no power but the extraordinary was conferred upon the Courts of Chancery in North Carolina; none has been conferred since, in relation to the subject under considei’ation. And we are, therefore, of opinion, that an attempt by a Court of Chancery, in this State, to exercise jurisdiction over the subjects of charities, beyond what would have been warranted by the extraordinary power of the Chancellor in England, is not justified by any of our statutes creating them, nor by the practice, nor usage.
But it has been urged, the statute of 43d Eliza, ch, 4, is in full force in this State, and that under its provisions the jurisdiction contended for is in existence. To this proposition I cannot accede; because, in the first place, to say the least of it, it is very doubtful, whether this branch of the Chancellor’s jurisdiction could have been derived therefrom; it certainly was not, unless it were by usurped construction; for this statute, as has been observed, was entirely of a remedial character, and only contemplated a speedy and effectual remedy for the abuse of trusts for charitable purposes, which had been or might be created, viz, by commission, under the superintendence and control of the Chancellor.
The powers given by the statute of 43d Eliz. ch. 4, have; *207 fallen into disuse in England, as we have seen, since it was held that the Chancellor had power by original bill, in the nature of an information, to effectuate the same ends designed by the statute. And the consequence is, that the question in controversy, in the present case, is not whether the statute is in force, but whether the practice of the Chancellor under it, is to be enforced in this State. I hold that it is not. Because, as has been said, the statute did not warrant the practice, but by usurpation under its construction, and because we have not the machinery necessary to carry into execution the practice. We have no parens patria. We have no Attorney General representing the executive, who can, as such, give information by bill, for the establishing and enforcing of trusts for charitable purposes. And the necessary consequence is, that the.su-perstruction must fall with the basis upon which it rested. But in addition to this, if this doctrine be recognized as in force in this State, we will necessarily be involved in much difficulty, upon the subject of what are charitable uses, in contradistinction to what are superstitious, unknown in England, and which will open a door to such conveyances, productive of consequences, startling in their effect and operation, and which we apprehend, those most in favor of the system would shrink from.
By'the 2d section of our Bill of Rights, it is provided, “That all men shall have a natural and indefeasible right, to worship Almighty God according to the dictates of their conscience; that no man of right can be compelled to attend, erect or support any place of worship, or maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given by law, to any religious establishment, or mode of worship.”
It cannot require argument to show, that the whole distinction existing in England, between trusts, charitable and superstitious, is broken down by this section of our Bill of Rights; and that the ground over which charitable trusts are to be spread, are tremendously extended, if we adopt the English practice upon the subject. Every creed of religion is neces *208 sarily embraced by it, and every institution calculated to promote it. We may, therefore, look for bills to establish charities for Roman Catholics, Jews, Mormons, Mahomedans, Uni-versalists, Unitarians, Deists, et id omnegerms, as far as the imagination of man maybe enabled to invent new forms or creeds. The system is at war with our habits, our form of government, and indeed, we think we may add, with common sense and reason, and cannot be enforced in our State. But let us test the devise in the particular case under consideration, by the English system. The words are, “I direct my executor to sell my mill, with the appertenances, and all and every species of property found in my possession at the time of my death, and not otherwise disposed of, and give one-fourth of the proceeds arising therefrom to the Tennessee Annual Conference of the Methodist Episcopal Church, for the benefit of institutions of learning under the superintendence of said Conference, and to the Missionary Society of the Methodist Episcopal Church, and to be otherwise disposed of, as the Tennessee Annual Conference may deem best in their wisdom.”
Now, it may be well doubted, whether the last clause of the devise, viz, “And to be otherwise disposed of as the Tennessee Annual Conference may deem best in their wisdom,”' does not control the preceding claims of the devise to schools and missionary society, and leave it, charity at large, to be disposed of by the Annual Conference of the Methodist Episcopal Church of Tennessee, for “benevolent purposes;” and therefore falling within the class of uses and trusts, not charitable, and not recognized by the Chancery Court of England, of which we have heretofore treated in this opinion sufficiently for the understanding of this proposition. But it is certain, that, put what construction you may upon it most favorable to its maintenance, it must fall within the rule, as established by Lord Eldon, and recognized by Mr. Story, that it is a general indefinite purpose of charity, not fixing itself upon any particular object, and unsupported by trustees to the uses, the disposition and administration of which, in England, would have been by the King under his sign manual, by virtue of his prerogative, as parens *209 patries, and cannot be sustained by a Court of Chancery, in virtue of any power recognized in this State.
But to illustrate still further. Under what rights do the complainants come into this court? They are not trustees of the charity under the will, and they have no legal or equitable interest in it: it is said by virtue of the act of the Legislature of the State of Tennessee, passed on the 23d day of December, 1841, appointing them trustees' to receive the charity. To this, then, there are two objections.
1st. The charity must stand or fall, as it was found to exist at the death of the testator. If it were not then legal and valid, no subsequent statute of the legislature can make it good, as it would be legislative action upon a subject beyond its control.
2nd. Because the act of 184Í is unconstitutional and void, under the 7th section of the 11th article of our amended Constitution, which provides, “That the legislature shall have no power to pass any law for the benefit of individuals, inconsistent with the general laws of the land, nor to pass any law granting to any individuals, rights, privileges, immunities or exemptions, other than such as may be by the same law extended to any member of the community, who may be able to bring himself within the provisions of this law.”
But it has been contended, that the executor of the will in this case is the trustee for the charity. This clearly is not so. He is directed to pay it to the Tennessee Annual Conference of the Methodist Episcopal Church, which is to appropriate it as devised. This would constitute the Tennessee Conference of the Methodist Episcopal Church the trustees for the charity, if it could legally be so, which it cannot, from not being incorporated, and cannot therefore be looked upon by this court as having any legal existence whatever.
I have not deemed it necessary to enter into an examination of the American authorities upon this subject; they certainly do not conflict with the general views of this opinion, upon the nature and the source of the jurisdiction of the Chancellor in England in enforcing charities, viz, delegated prerogative. The Assistant Vice Chancellor of New York, in the conclusion of his elaborate opinion in the case of Wright and others vs. The *210 Trustees of the Methodist Episcopal Church, 1 Hoffman’s Rep. 265, in which he has brought under review most of the cases, observes: “With respect to the mode of enforcing the rule, it seems now admitted in England, that if there is no trustee, and the object is wholly undefined, the King administers the charity under his sign manual as parens patria. And in the case of Morrell vs. Lawson, 5th Vin. Abr. 500, Lord Chancellor Parker says, that when a bill is brought to establish a charity given by will to persons uncertain, and incapable of suing or being sued, the suit must be in the name of the Attorney General ex necessitate rei: because there are no certain persons entitled to it, who can sue in their own names.” But the Vice Chancellor in continuation observes; “There is ample authority in our own country to establish, that the States now represent that particular branch of the royal power as parens patriaTo this portion of the opinion I have not been able to yield my assent: that is, that the States do represent that branch of royal prerogative. I admit there are American decisions sustaining charities, which could only have been decreed in England under the prerogative. To which, all I have to say is, that if the courts that made them, felt satisfied that they had the jurisdiction, and the necessary machinery for a correct exercise of it, I do not object to them, but cannot hold them obligatory on us: because I am satisfied that no such jurisdiction has been intrusted to us, and that we have no syste m, by means of which a proper exercise of it could be ensured, if it had. And I feel no disposition to strain after power to enforce a bequest, so objectionable in all points as the present, and one which, even in England, would now be held void under the statute'of George the 2nd.
Upon the whole, therefore, I consider the devise void and inoperative; that the-executor holds the proceeds under it, as he does the balance of the estate, subject to distribution among those entitled to it by the law; and am, therefore, in favor of sustaining the demurrer and dismissing the bill with costs.
Judge Reese delivered a verbal opinion, in which he concurred in the general propositions laid down in the opinion de *211 livered by Judge Turley, and in the propriety of affirming the decreé of Chancellor McCambell.
John J. White, Special Judge,
delivered the following opinion.
This is a bill filed by A. L. P. Green and others, Trustees appointed by an act of the General Assembly of the State of Tennessee, in December 1841, for the purpose of receiving the donation under the will of William Wright, deceased, and as members of the Tennessee Conference of the Methodist Episcopal Church, in behalf and by order of the Conference, and Robert R. Roberts, President of the Missionary Society of the Methodist Episcopal Church, and Senior Bishop of said Church in behalf of said Society, against the Executor and heirs at law of William Wright, deceased.
The object of the bill is, to establish the validity of the bequests contained in the will, to the Tennessee Conference and to the Missionary Society of the Methodist Episcopal Church; and that the Executor may account to complainants, in behalf of the Conference and Society, for that portion of the fund which has been bequeathed to them; and they pray for general relief.'
It appears from the exhibits in the bill, that the boundaries of the Tennessee Annual Conference-include Middle Tennessee and North Alabama.
It also appears, that the Conference consists of all the travel-ling Preachers who are in full connection, and those who are to be received into full connection with that body; that the Methodist Episcopal Church consists of 34 Annual Conferences, and that the Tennessee Conference was organized more than thirty-one years ago.
It also appears, that the Missionary Society of the Methodist Episcopal Church, has its annual election of officers in the city of New York, and that it is managed by a President, Vice President, Treasurer and Assistant Treasurer, Secretary and thirty-two Managers — and that the Association is established for the purpose of enabling the several Annual ■ Conferences *212 more effectually to extend their missionary labors throughout the United States, and elsewhere; and also to assist in the support and promotion of missionary schools and missions, in this and in foreign countries.
It also appears, that the Board has authority to appropriate money to defray incidental expenses; to provide for the support of superannuated missionaries, widows and orphans of missionaries, who may not be provided for by the Annual Conferences; to print books at their own press for the benefit of Indian and other Foreign Missions, &c.
The defendants demurred to the bill in the court below; the Chancellor sustained the demurrer and dismissed the bill, from which complainants appealed to this court.
The provisions of the will, which is dated 25th July, 1840, so far as this case is concerned, are as follows:
Item 4th. “I desire that my mill, with the appurtenances thereto, and all and every species of property found in my possession at my death, not otherwise disposed of, shall be sold.
Item 5th. “I desire that one-fourth of the money arising from the sale of all the property disposed of as above mentioned, shall be given to the Tennessee Annual Conference of the Methodist Episcopal Church, for the benefit of Institutions of learning under the superintendence of said Conference, and to the Missionary Society of the Methodist Episcopal Church, and to be otherwise disposed of as the Tennessee Annual Conference may deem best in their wisdom.
Item. 7. “Heave my trusty friend, Nathaniel H. Allen, executor to this-my last will and testament.”
This will was made by a competent testator, has been executed according to all the forms of law, and regularly admitted to probate in the county of Montgomery, where the testator died, at the August term, 1840, of the court, and the question now is, shall this bequest contained in it be sustained?
The questions involved here, are of deep interest; they have been discussed by the counsel, with signal ability, and I have given them a laborious and careful examination.
The general and obvious rule, which has always governed the courts, is to endeavor to carry into effect the intention of the *213 testator; and all tbe guards which have been thrown around the execution of wills by the law, have been for the purpose, the more effectually to secure that object. And this accords with the best interests of society, that the same freedom which is secured to every man in the acquisition of property, should be continued to him in its ultimate disposition, for without that the former is essentially impaired, and you take from the citizen the highest motive to useful and honorable exertion. And such is the irresistible influence of family and social relations, there is but little danger to be apprehended of any man’s disinheriting the proper objects of his bounty. See 4 Kent’s Comm. 501, 4 edition. But at the same time, there is another rule which should never be lost sight of by the court, that this testamentary disposition should be in accordance with, and not repugnanttothe rules of law. Legum servandafides, suprema voluntas, quod mandat fierique jubet parere necesse est. 7 Bacon’s Abr. 342.
And I would remark in the outset, that we are not involved here in any discussion in regard to perpetuities, or the conveyance of real estate, for the express direction of the testator to sell tbe property, and to pay over the proceeds of the sale to the objects specified in the 5th and a.subsequent clause in the will, has changed the character of the real estate and converted it into personalty. It operates as <!a conversion out and out,” and makes the question here, solely one in reference to the bequest of personal property. It is said by Sir William Grant, blaster of the Rolls, in Berry vs. Usher, 11 Ves. 91, that where it clearly appears to have been the intention of the testator, to impress upon real estate the character of personal estate to all intents and purposes, the mere appointment of an executor will be sufficient to carry that property to him either for his own benefit, in cases where he is beneficially entitled to the personal estate, or as a trustee for others, where he holds the personal estate on the like trust. See 1 Roper on Legacies, 341, et seq. 1 Williams on Ex’rs, 417, 418.
This brings us to the important question whether this is a good bequest contained in this will, and whether it is of such a *214 character, that the trusts created by it will be sustained and enforced in a Court of Equity?
And, 1st. In regard to the objects of the bequest. It cannot be denied that they are of the most beneficent character. It is for the benefit of institutions of learning under the superintendence of the Tennessee Annual Conference of the Methodist Episcopal Church, and to the Missionary Society of the Methodist Episcopal Church. In other words, the object of the testator, in making the bequest, is to advance the cause of human learning, together with the spread of the Gospel, and the consequent improvement and amelioration of our race. Letters promote civilization, and when connected with the Christian religion in all its unapproachable beauty and grandeur, the result is the highest and most perfect state of human society. According to Lord Coke, in Porter's case, 1 Coke, part 1, p. 24, there was no time so barbarous as to abolish learning and knowledge; much more in this enlightened day, do they demand encouragement and support from every virtuous citizen.
We need not go back to a remote antiquity for authority upon this subject, for we find these principles incorporated into odr fundamental laws. So strongly impressed were the framers of the amended Constitution of Tennessee, with the importance of these objects,' that by an express provision, they made it “the duty of the General Assembly, in all future periods of this Government, to cherish literature and science.” See Art. 11, sec. 10. This to be sure is merely a direction to the legislature, but it nevertheless indicates the popular feeling and the public policy upon this great question.
The act too of the General Assembly of the State, passed in December 1841, (See Acts of Tennessee, 1841-2, p. 23,) appointing trustees to receive and administer this charity, although not to be regarded for any other purpose, may still be appealed to, as furnishing evidence in favor of the- character of the bequests contained in the will.
In the Constitution of the United States, (amendments, Art. 1, sec. 1,) is the following provision: “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” And in the Declaration of Rights, pre *215 fixed to the Constitution of Tennessee, it is declared, “That all men have a natural and indefeasible right to worship' Almighty God according to the dictates of their own conscience;” “That no human authority can, in any case whatever, control or interfere with the rights of conscience: and that no preference shall ever be given, by law, to any religious establishment or mode of worship.” Sec. 3. The great principle then of religious freedom, as I believe, which is secured and guarantied by the Constitution, authorized the testator to make this bequest, for the purposes mentioned in the will, and to place the same under the control of any religious denomination whatever.
But although the object of the bequest is such a one as must commend itself to the regard of an enlightened judiciary, being unquestionably for pious and charitable uses, according to all the authorities, the important enquiry still remains, whether the testator has made this disposition in such a way that it is valid and can be enforced by this court?
The argument on the part of the defendants, is,
1st. That these Societies, to whom the bequest is made, are mere voluntary associations, unincorporated, and not capable in the law of taking the bequest, and that the same is therefore void. And
2nd. That there are no trustees created by the will; no legatee to take; nor any trust declared with sufficient certainty, nor the manner of its execution, but that it is altogether vague and indefinite, resting upon an arbitrary and uncontrolled discretion; and consequently invalid and not to be enforced in a •Court of Equity.
And this brings me to the next question which I propose to examine, which is, whether this court by virtue of its common law powers, independent of the Statute of 43 Elizabeth, ch. 4, in regard to charitable uses, has not the power to execute and enforce the trusts contained in this will? Upon principle it would seem, that a Court of Equity must possess the power independent of positive statute, for one of the most fruitful, as well as acknowledged sources of equity jurisdiction, has always been the execution of the trusts of a will or other instrument, according to the intention expressed in that will or instrument. *216 Attorney General vs. Iron Mongers Company, 2 Mylne & Keen, 581: 2 Story’s Eq. Jur. 534, edition of 1843. The jurisdiction of chancery over trusts was never questioned by the most strenuous advocates of the common law, says Mr. Justice Baldwin, in the case of Sarah Zane's will, p. 50, and which he supports by reference to numerous authorities. In the present case, the object of the testator is palpable, and he is exercising an acknowledged right in the disposition of his property. Suppose that for want of adequate information at the time, or the necessary legal assistance, being in extremis, some matter of form should be neglected, as for instance, the appointment of a competent trustee as contended for, shall this accidental omission frustrate his will and cause the bequest to fail, or would not the court in the exercise of its acknowledged powers, remedy this defect if it existed, and carry out the intention if not illegal? In this case, however, asl regard it, no such defect exists, nor is any such power necessary to be exerted by this court. It seems to me that the power which this court is now called upon to exercise in reference to this will, must .be regarded asoné of the inherent, substantive, independent powers of a Court of Equity.
That a trust was intended to be created by the testator there can be no question. He directs that one-fourth of the money arising from the sale of the property mentioned, “shall be given to the Tennessee Annual Conference of the Methodist Episcopal Church for the benefit of Institutions of learning under the superintendence of said Conference.” Here the fund is pointed out, the object to which it is to be applied, and the body which is to have the control and superintendence of the same. What more is necessary to constitute a good and valid trust? Is it to be expected that a man, by his will, would point out the exact specific application of the fund?
The bequest adds, “And to the Missionary Society of the Methodist Episcopal Church.” This Association is described with sufficient accuracy to be clearly understood, which is all that is necessary. See 4 Wheat. 28. It is true there is no specific direction given in regard to the application of this part of the fund, except in the language before-mentioned — nor was *217 any such direction, as I believe, necessary, nor could it have been expected to be given, as already intimated, in a last will and testament. It does not purport to be given to the individuals composing the Society as their own property, but to the Society itself, of course in their aggregate capacity and for the purposes of the Society, and to have specified them would be superfluous. The words used themselves, ex vi termini, are sufficient.to create a trust. They import that the fund is to be applied by the Society, and for the purposes for which that Society was organized, which are admitted in the pleadings to be for the support and promotion of Missionary Schools and Missions, Printing Books for the benefit of Indian and other Foreign Missions, and for the purpose, in short, of the more effectually extending their missionary labors throughout the United States and in foreign countries. The testator must be presumed to be acquainted with the objects for which the Society was organized, and that he desired to have the fund applied to those objects. It is like “a devise to a hospital, or any known institution; it is for the uses and purposes intended by the founder.” So here, the bequest “to the Missionary Society of the Methodist Episcopal Church,” must be for the purposes contemplated by that Society, and can be applied to no other. And upon a .case being made out of an abuse, or misemployment of such a charity, or an invasion of their rights, a Court of Equity will afford relief. 2 Peters, 584-5: 9 Cranch, 43: 9 Cowen, 482: 7 Vermont Rep. 285, 310: 1 Atkyns, 356: 3 Merivale, 400: 1 Chancery Cases, 134, 193: 1 Eq. Cases Abr. 99, 3 Peters, 499: Ambler, 526: 16 Ves. 321.
It is true that the will proceeds, “And to be otherwise disposed of as the Tennessee Annual Conference may deem best in their wisdom.” But I take it this general, indefinite direction, cannot control or render nugatory the direct and specific appropriation of the fund which had been before made. It is a rule, that general words in a will may be restrained to make the whole will consistent. 6 Ves. Jr. 129: 7 ditto, 403: 10 do. 595: 7 Bacon, 341. And again: general and doubtful words in a will shall not alter an express devise before, nor carry any thing contrary to the apparent intent. 7 Bac. 342. Nor can *218 an express disposition be varied by inference or argument from other parts of the will. 2 Williams on Ex’rs, 716: 1 Ves. Jr. 269: 8 ditto, 42. This general clause, then, must be regarded as subordinate and subject to the specific bequest contained in the will, and cannot in any respect alter the law which arises upon it.
It seems to me, then, upon principle, that this is a good trust, created by the will; it has been defined with sufficient certainty, the property and the way it is to go indicated, which the court can see, and by virtue of its general jurisdiction over trusts, enforce the same, and cause the fund to be applied to the objects intended. Even if no trustee was appointed, or the trustee was incompetent to take, the bequest would not upon that account fail, for it is the trust and not the trustee that gives a Court of Equity jurisdiction, and when necessary the court will appoint a trustee to execute the trust. 4 Dana, 358, Moore vs. Moore: 9 Cowen, 484, McCartee vs. Orphan Asylum Society: 3 Edwards, 79: 2 Peters, 583: 2 Kent, 286, note, 288, note: 7 Vermont, 294: 3 Yerg. 268.
In this case however, as it is believed, the executor has full authority under the will to sell and convert the estate into money, and that he will then hold the fund as trustee for the legatees. 3 John. Ch. 215: 10 Yerg. 104: 4 Dana, 358: 2 Peere Williams, 211: 1 Atk. 458. And when the fund is paid over by the executor to the proper officer of the different Societies, these Societies will then hold the fund as trustees for the purpose of carrying into effect the declared intention of the testator.
I will now proceed to examine this upon authority. In the opinion of distinguished jurists, the leading principles in regard to charities have been drawn from the civil law and en-grafted into the common law. This was the opinion of Lord Thurlow, in White vs. White, 1 Br. Ch. Cas. 12; and that of Lord Eldon, in Moggridge vs. Thackwell, 7 Ves. 36, 69; and likewise of Mr. Justice Story, 2 Story’s Eq. 489. These principles, however, may no doubt be traced to a still higher source, the Christian religion, and were engrafted from that upon the civil law. See 1 Hoffman, 245. And from the time of Justinian, it became a fixed maxim of Roman jurisprudence, that *219 legacies to pious uses, which included all legacies for works of piety or charity, were regarded with peculiar favor. 2 Dom. Civil'Law Book 4, p. 168, 170. The same rule has been adopted into the common law, with regard to charities, and has universally received the sanction of the English courts, and of the highestjudicial tribunals in the Union. 2 Story, 490, 512. The reason of this is obvious, for they benefit society, advance civilization, and are injurious to none.
The sources of information in regard to the early exercise of powers by a Court of Chancery are necessarily very obscure, as the-Reports of adjudged cases in chancery are exceedingly imperfect until after the restoration. 1 Kent, 492, Sarah Zane's will, 50. But still there is the highest authority in favor of the original, inherent, and necessary jurisdiction of a Court of Chancery over bequests and devises in trust for charities as well as other objects. Lord Northington in the case of the Attorney General vs. Tancred, 1 Eden, 10, 1 Wm. Black. Rep. 91, states it to have been the uniform rule of the Court of Chancery before, as well as at and after the Statute of Elizabeth, when the uses were charitable; and the grantor competent to convey, to aid even a defective conveyance to uses. Sir Joseph Jekyll, in Eyre vs. Countess of Shaftslury, 2 Peere Wms., 119, speaks of it as “an original right” in a Court of Chancery, and that “abstracted from the Statute of Elizabeth relating to charitable uses, and antecedent to it, as well as since, it has been every day’s practice to file informations in chancery in the Attorney General’s name for the establishment of charities.” Lord Chancellor Somers, in the case of Falkland vs. Bertie, 2 Vernon, 342, speaking of things that fall under the care and direction of a Court of Chancery, among others, mentions that of “charities.” Lord Redesdale, in the case of the Attorney General vs. Mayor of Dublin, 1 Bligh’s Rep. 347, in speaking of the Satute of Elizabeth, with respect to charitable uses, says, “That statute only created a new jurisdiction; it created no new law. It created a new and auxiliary jurisdiction, a jurisdiction created by commission, &c.; but the proceedings of that commission were made subject to appeal to the Lord Chancellor,” &c. In Duke on Char, uses, *220 163, it is stated, that Symons sold lands, by bargain.and sale, to Fleming, upon trust to perform a charitable use which the testator declared by will. The deed was void for want of en-rolment, and yet the Lord Chancellor decreed a sale of the lands by the heir, to be applied according to the limitation of the use. This was in the 24 Elizabeth, and before the statute of charitable uses, and shows conclusively the common law jurisdiction of Courts of Chancery at that time, in sustaining defective conveyances to charitable uses. In Attorney General vs. Middleton, 2 Ves. Sr. 327, Lord Hardwicke held, in cases of charities at large, and not regulated by charter, the Court of Chancery before, and independent of the Statute of Elizabeth, exercised original jurisdiction. Chancellor Kent, 2 vol. 288, says, “It would appear from the preamble to the Statute of Elizabeth, that it did not intend to give any new validity to charitable donations, but rather to provide a new and more effectual remedy for the breaches of those trusts.” And adds in a note, “the statute defined the charities which chancery would protect, and were to be enforced; but the better opinion is, that it left the jurisdiction as it existed prior to the statute untouched.”
I deom it unnecessary to refer minutely to all the cases that have been decided by the English courts, where charities have been sustained upon common law principles, and under the general powers of a Court of Equity,independent of the statuteof 43 Elizabeth. A brief reference to a few others must suffice. The case of Mayor and Burgesses of Reading vs. Lane, 43 Elizabeth, Tothill 34, was a devise to the poor people maintained in the hospital of the Parish of St. Lawrence in Reading forever. This was sustained. See too the case of Palmer vs. Newman, 21 and 2 of Car. 2, 1 Ch. Cas. 157, in which it was declared by the court, that the King as pater patria might inform for any public benefit for charitable uses, before the statute for charitable uses. Also the Attorney General vs. Combe, in 1679, 2 Do. 18, where a devise to charity was decreed, which was not within the statute of 43 Elizabeth. Also the Poor of the Parish of Dunstan vs. Beauchamp, 1 Ch. Cas. 193. The decree had been made by commissioners upon the statute *221 of charitable uses. Those for whom the decree was made brought an original bill to enforce it. It was decreed by the LordKeeper, that the decree of the commissioners should be confirmed. So the case of the Attorney General vs. Matthews, 2 Levinz, 167, where the residue was for the use of the poor forever. It was a case not within the statute of charitable uses, but a decree was made under the general powers of the court. In the case of the Attorney General vs. the Master of Brentwood School, 1 Mylne & Keen, 376, we see that a decree was made in Chancery, in the 12 of Queen Elizabeth, upon the will of Sir Anthony Brown creating a charity. See too the case of the Thetford School, reported in Popham, 6 and 7, and in Croke Eliz. 288, which arose upon the will of Sir Nicholas Fulmerston, which was made in 1566 — And, also, the case of the Attorney General vs. The Master and Wardens of the Skinner’s Company, 2 Russell, 407.
In addition to the foregoing I would remark, that a work has been published in England, under the authority of the Commissioners of Public Records, called “A Calendar of the Proceedings in Chancery in the reign of Queen Elizabeth, to which are prefixed examples of earlier proceedings in that court, from the reign of Richard 2d, to that of Queen-Elizabeth, inclusive,”’ which furnishes the most conclusive evidence of the correctness of the position here assumed. From this it appears, that the jurisdiction of a Court of Chancery in matters of trust, was fully established as early as the reign of Henry 6th, nearly a century and a half before the Statute of Elizabeth. (See a notice of this work in the London Jurist, 348, et seq.) Ai.d if in ordinary trusts, most assuredly the most important and highly favored of all trusts, that of charities, could not be excluded. Indeed two of the cases in that reign, are charities under a will, to wit, the case of Babington vs. Gall, and Wakening vs. Bayle. Vol. 1, p. 56-7. In the first case, the bill states, that plaintiff’s mother had placed 600 marks in defendant’s hands for the purpose of founding a chantry in the Church of St. Peters. The answer admits the trust, but adds, that if the endowment of the chantry was not completed within four years, the money was to be applied to other purposes, and concludes *222 by submitting to pay the money according to the directions of the court. The latter case is a bill to compel the defendant, who is a feoffee in trust, to make an estate of certain lands, in Tottenham, to the Hospital of St. Bartholomew, for the endowment of a chapel there. Mr. Justice Story, in the opinion which he delivered in the Supreme Court of the United States, January term, 1844, in the great case arising upon the will of Stephen Girard, in'speaking of this work, says, that in it are to be found many cases in which the Court of Chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth, and that “they establish in the most satisfactory and conclusive manner, that cases of charities, where there were trustees appointed for general and indefinite charities as well as for specific charities, were familiarly known to, and acted upon and enforced in the Court of Chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were not competent to' take. Whatever doubts, therefore, might properly be entertained upon the subject, when the case of The Trustees of the Philadelphia, Baptist Association vs. Hart's Ex'rs, 4 Wheat. 1, was before this court in 1819,[those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded.” 2 Howard, 196. This language is the more important, because previously to this, Mr. Story had been inclined to concur in the opinion which he attributes to Lord Eldon, in Attorney General vs. Bowyer, 3 Ves. 714, 726, that prior to the time of Lord Ellesmere, who was made Lord Chancellor in 1596, bills were not filed in chancery to establish charities. See appendix to 3 Wheat. 487-8: 2 Story’s Equity, 495-6, 3 edition. This suggestion, however, was not made by Lord Eldon, but by Lord Lough-borough, as will be seen from the case before alluded, to. It is .evident that Lord Eldon was of a different opinion from the case of the Attorney General vs. The Skinner's Company 2 Russell, 407, which arose upon a will dated in 1558, anterior to the statute.
*223 The authority which is sometimes referred to in opposition to this view, and which seems to be so regarded by Judge Marshall, in the case of the Baptist Association vs. Hurt's Executors, 4 Wheat. 35, is that of Porter's case in 1 Coke’s Rep. 17, which was a case at law. It was in 34 and 35 Elizabeth, and consequently before the statute of 43 Elizabeth, ch. 4, in regard to charitable uses. This was a devise of lands devisable by custom to the testator’s wife for life upon condition that she should assure the lands devised for the maintenance and continuance of a free school and certain almsmen and almswomen. The heir entered for condition broken, and conveyed the lands to the Queen. It was held that the use, being for charity, was good. Lord Loughborough in commenting upon it in Attorney General vs. Bowyer, 3 Ves. Jr. 726, says this case establishes the doctrine, “that if a feoffment is made to a general legal use, not superstitious, though indefinite, though no person is in esse who could be the cestui que use, yet the feoffment is good; and if it was bad, the heir of the feoffor would have been entitled to enter, the legal estate remaining in him.” Now, this case may be regarded as important in one point of view, in answer to the argument which urges the indefinite character of the present bequest, against its effectuation, as it shows there was some tribunal at that time, competent to sustain it. Nor does it follow, because this was held to be a good charity in a court of law, that a court of equity, upon a proper case being presented, would not sustain and enforce a trust for charitable purposes, but rather the reverse, because relief would be much more effectual in a court of equity from the nature of its organization.
The principles involved in this case have been examined by Mr. Justice Baldwin of the Supreme Court of the United States, with unequalled learning and research, in the case of Sarah Zane's will, which was decided in 1833. She was of the city of Philadelphia, and among other things, made a bequest to the Society of Friends in the city of Philadelphia, for the relief of the poor members thereof — to that in Baltimore, towards their “stock,” which was applied to the printing of books of a religious character, &c. — and to that in Virginia, towards the *224 relief of the poor of the society, enlarging their meeting-house, &c. These societies were unincorporated. He says, that “the common law requires no charter to enable a body of men in any place to purchase chattels or receive donations of money, a chattel interest, or an estate for the lives of the grantees in land by their name- as a body without other words; if one is necessary it can be only to give them some privilege, immunity or exemption from the rigor of the common law, so as to make them as a natural person capable of enjoying an estate in fee without words of inheritance.” Pamphlet opinion, page 30. And again, that at the common law, “charities were left free for the exercise of the jurisdiction of the respective courts, which in all cases gave effect to'the disposition of a testator, whenever his intention was expressed, or could be collected from the will, notwithstanding any defect in form, or the want of naming or designating an object to take; they would give it locality and application to those persons or bodies who were capable, if they could by any reasonable intendment be brought within the devise.” P. 47. He shows too that the general course of equity before the 43 Elizabeth, in all cases of charities, was according to rules and principles as well settled and defined as on any other subjects, and was the basis on which the law now stands on the construction of that statute. The bequests in this will were sustained, and the administrator with the will annexed was directed to pay the respective bequests to the persons appointed to receive and distribute them. See Coke upon Littleton, 3, A.
Questions in regard to charities have frequently come before the-enlightened courts of the state of New York. In Potter vs. Chapin, 6 Paige, 649, the Chancellor says: “although some doubt was thrown upon the question of charitable donations for the benefit of a community or body not incorporated so as to be capable of taking and conveying the legal title to property by the decision of the Supreme Court of the United States in the case of The Baptist Association vs. Haris Executors, 4 Wheat. 1, I believe it is generally admitted that the decision in that case was wrong. And it may now be considered as an established principle of American law, that the Court of Chancery *225 will sustain and protect such a gift, bequest or dedication of property to public or charitable uses, provided the same is consistent with local laws and public policy, where the object of the gift is specific and capable of being carried into effect according to the intention of the donor.” And the fund, was directed to be paid over to the trustees of the school districts.
In 7 Paige, 79, Dutch Church vs. Mott, it is decided that the statute of Elizabeth relative to charitable uses was never in force in the state of New York. But independently of that statute, the. Court of Chancery had an original jurisdiction to enforce and compel the performance of trusts for pious and charitable uses.
The case of King vs. Woodhull, 3 Edwards, 79, was decided by the Vice Chancellor of the State of New York. That was a bequest not to a trustee, but immediate, to an unincorporated voluntary association, the Home Missionary Society, where neither the object of the bequest was specified, nor any purposes to which the money was to be applied. The Vice Chancellor •says, the testatrix must be supposed to know the purposes for which the society was formed, and to what objects and uses its funds were applied; that it was manifestly her intention to aid the funds of the society and promote its usefulness by the donation; that by looking into the fundamental articles of the society, the objects of it may be seen and understood — (which were to afford assistance to religious congregations which were unable to support a gospel ministry, and to send the gospel to the destitute within the United States) — and that it will thus be seen to be a public charity neither inconsistent with law nor against public policy. And he sustained the bequest, upon the general jurisdiction of the court independent of the statute of 43 Elizabeth — and the money was directed to be paid by the executors to the treasurer of the society as a valid bequest to a charitable use.
In Coggeshall vs. Pelton, 7 Johns, ch. 292, a pecuniary legacy to the town of New Rochelle for the purpose of erecting a town house for transacting town business, although no trustee was named, was held valid as a charitable bequest, in the exercise of the common law powers and jurisdiction of the court.
*226 In Wright and others vs. Trustees of Methodist Episcopal Church, 1 Hoffman, 205, which was a bill filed by the executors for the purpose of obtaining the directions of the court as to the distribution of the surplus fund of the estate of the testator in their hands, one question was as to the validity of the bequest of the residue to “the yearly meeting of friends in New York,” which was a voluntary unincorporated society. The question is ably examined, and the conclusion is, that the power to enforce such a charity is in the court by virtue of its original constitution, independent of the statute. The bequest was held valid, and it was declared, that payment to the treasurer would be a full protection to the executors. See too the case of McCartee vs. Orphan Asylum, Society, 9 Cowen, 437, in which Chancellor Jones vindicates the jurisdiction of a court of chancery over charities anterior to the statute of Elizabeth. This case was reversed on appeal to the Court of Errors upon other grounds, but the opinion of the Chancellor upon this point not questioned.
In Pennsylvania, where it has been decided that the statute of 43 Elizabeth, ch. 4, is not in force, it was held that a bequest “to St Michael’s and Zion’s Churches,” to be laid out in bread annually for ten years “for the poor of the Lutheran congrega» lion,” and likewise a bequest for the education of young students in the ministry of the German Lutheran congregation, were good. The Chief Justice, in delivering his opinion, seems inclined to go further than they have in England in adjudicating upon that statute; for he intimates that a bequest such as in Morrice vs. The Bishop of Durham, 9 Ves. 399, would be supported by that court. The Chief Justice adds: “It is immaterial whether the person to take be in esse-or not, or whether the legatee were at the time of the bequest a corporation capable of taking, or not, or how uncertain the objects may be, provided there be a discretionary power vested any where over the application of the testator’s bounty to those objects. If the intention sufficiently appears in the bequest, it would be held valid.” Wilman vs. Lex, 17 Serg. & Rawles, 93.
In Massachusetts, similar adjudications have been made. Burbank vs. Whitney, 24 Pick. 146, was a bequest to the Amor- *227 lean Bible Society, and to the American Home Missionary So" ciety, voluntary associations. The executor had paid over the bequests to the societies. The Probate Judge allowed the account of the executor, from which there was an appeal. The court say there is no doubt that donations to charitable purposes were held valid previous to the statute of Elizabeth, and that they were good although the charity was to be distributed by a society or body of men who were not incorporated, and although no person was in esse who could be the cestui que use. They proceed however to say that the statute of Elizabeth had been adopted in principle and substance in the State, and that it was clear that the payment of these legacies might be enforced by the court as a court of equity. “By the will a trust was created; and on the death of the testator the legal estate vested in the executor, and not in the legatees. He held it in trust for them and was bound to collect and pay over the money according to the directions of the will. And this trust the executor might be compelled to perform by the court as a court of equity, if he had not performed it voluntarily.” P. 153. But in this case the executor had paid the legacies, and all that the court therefore were required to do was to sustain his claim for an allowance for the payment, which was done. See too the case of Bartlett and, others vs. Nye and others, 4 Metcalf, 378, and Going vs. Emery, 16 Pick. 107.
In 7 Vermont Reports, 241, is an important case which was well considered by the Chancellor — the case of the Executors of Burr vs. Smith and others, and which grew out of a bequest to the American Bible Society and other unincorporated societies. The form of the bequest was to “the treasurer for the time being of the American Bible Society,” &c. It was held that courts of chancery had jurisdiction of bequests to charitable uses, before the statute of-43 Elizabeth, by virtue of their equity jurisdiction, and that a gift to a charitable use might be decreed, notwithstanding the objects were vague and indefinite and the persons who were to carry into effect the intent of the testator, were a society unincorporated. The Chancellor sustains the bequest. He says' that societies or bodies of men unincorporated have ever been considered, at common law, as capable *228 of receiving gifts or legacies, to be applied to charitables uses-P. 278. He says there can be no objection in decreeing the money tobe paid to the one who ordinarily receives and keeps the funds of the societies;- and in this case it is decreed that the legacies shall be paid to the treasurers of the societies for the time being,, who are to receive them for the use and benefit of the societies, to be disposed of by them for the objects contemplated in their associations, agreeable to the intent of the testator. P.311.
In Kentucky, it was held in the case of Moore's heirs vs. Moore's devisees and executors, 4 Dana, 354, that a devise to the County Court of Harrison of a fund to educate poor orphans,, is not illegal,, nor void for uncertainty, when tested by the rules of the common law alone, but might be enforced independently of any English statute; that the case was not prerogative but judicial and equitable. It was likewise held that the statute of Elizabeth so far as relates to giving validity to gifts for charitable uses, was in force in Kentucky, though so far as the remedy was concerned, the appointment of commissioners, it was not applicable to' their institutions, and therefore not in force there.
In North Carolina, 1 Hawke’s Law and Eq. Reports, Griffin vs. Graham, 97, it was held that the statute of 43 Elizabeth, was in force in that State; but that independent of that statute, the court of equity had jurisdiction. In this case, the object of the bequest was, the establishment of a school for the education and maintenance of poor children, and it was sustained.
I will now notice briefly, the decisions which have been made-by the Supreme Court of the United States upon this question. The case of the Trustees of the Philadelphia Baptist Association vs. Hart's executors, 4 Wheat. 1, arose upon a bequest to “the Baptist Association, that for ordinary meets at Philadelphia-annually,” which was to be a perpetual fund for the education of youths of the Baptist denomination who shall appear promising for the ministry. It was held that the association, not be*-ing incorporated, could not take the trust as a society; that it was likewise void for uncertainty as to the devisees, and could not be established by a court of equity exercising its ordinary *229 jurisdiction independently of the statute of Elizabeth. This was a case which arose under the laws of Virginia where the statute of 43 Elizabeth, ch. 4, had been repealed. I consider however, that this case in effect has been overruled by later decisions of thip high -tribunal.
In Beatty vs. Kurtz, 2 Peters, 566, a lot of ground had been marked out by the proprietor, upon the original plan of the town, for the use of the Lutheran Church, a voluntary unincorporated society.' This was sustained in favor of the society upon a bill filed by a committee in behalf of the society.
The case of Inglis vs. The trustees of the Sailor’s Snug Harbor in the city of New York, 3 Peters, 99, was one where the testator gave his estate both real and personal to the Chancellor of the state of New York and the Recorder of the city of New York (and other persons by their official description). and their successors in office, to establish an asylum called “The Sailor’s-Snug Harbor,” for the purpose of maintaining aged and de-crepid sailors. He further directs that if his intention cannot be legally carried out without an act of the legislature, that they shall apply for an act of incorporation. The legislature of the state of New York afterwards incorporated them for the purpose of executing the trusts declared in the will. The court sustained this devise upon common law' principles, and declared this was a valid devise to divest the heir of his legal estate, or at all events to affect the lands in his hands with the trusts declared in the will. The principle of this case, as I think, is directly in conflict with that in 4 Wheat, before referred to. It will be perceived that the object of the bequest, the maintaining aged and decrepid sailors, is quite as vague as the one in that case, and if the bequest to the Baptist Association was invalid in consequence of the incompetency of the trustee to take and manage the fund, the members of the Association continually changing, the same objection would exist. against the persons mentioned here and their successors in office; and if the devise was actually void, which it would have been according to that case, and the property had been vested in the next of kin, it is-clear that no subsequent act of incorporation would divest it.
In Cincinnati vs. White’s lessee, 6 Peters, 431, the court ad *230 verting to the rule which prevails in private grants, that there must be a grantee as well as a grantor, say, “that is not the light in which this court has considered such dedications for public use. The law applies to them rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor, and secure to the public the benefit held out and expected to be derived from and enjoyed by the dedication.”
In the case of Vidal et al. vs. Girard's executors, 2 Howard, 128, before referred to, one of the objections to the establishment of the will was, that the beneficiaries who were to receive the benefit of the charity were too uncertain and indefinite for the bequest to have any legal effect. These are declared in the will to be “poor white male orphans between the ages of 6 and 10 years,” first of the city of Philadelphia; 2nd, those born in any other part of Pennsylvania; 3rd, of the city of New York, and lastly those of New Orleans. The court review the case in 4 Wheat, and the authorities on which it was founded, together with the later sources of information upon this question, and come to the conclusion that this is a valid charity independently of the statute of 43 Elizabeth.
Some of the authorities in opposition to this view of the question, have already been sufficiently noticed and commented upon. But we are likewise referred to the case of Holland vs. PecJc, 2 Iredell, 255. In this case the bequest was more general than the present, it being for the benefit-of the Methodist Episcopal Church in America, whereof Francis Asburj at the date of the will was the presiding Bishop; no specific object indicated to which the fund was to be applied, but it was to be disposed of by the Conference or the different members composing the same, as they shall judge most expedient for the spread of the gospel. With all my respect for the character and virtues of Judge Gaston, I do not regard this case as a high authority, for it was evidently not much considered, but little discussion upon principle, and not a single authority from the English law referred to except that of Morrice vs. Bishop of Durham, 9 Ves. 405, nor any of the American cases upon the subject of charities. The reasoning however of the Judge *231 would be sufficient at least to support one of the bequests in this will, to the Tennessee Annual Conference; for he asks, “Is the money to be employed in building churches, in establishing schools, in paying ministers, in publishing books, or in supporting the poor? These, and many such as these, would appear to be means tending to promote the spread and increase of the gospel; and any of them, had they been definitely expressed, might be regarded as specific charitable objects, which the court could cause to be executed, although-the trustees designated by the testator were unable to perform them.” P. 259, 260. This case was decided upon the ground that the Methodist Episcopal Church not being incorporated, could not take or hold property, and that the precise manner in which the fund was to be applied, not being indicated, the bequest was rendered indefinite and void, which as I think has been abundantly shown heretofore to be an unsound view of the law.
Another authority relied upon is that of Dashiell vs. Attorney General, 5 Har. & John. 392, decided in Maryland in 1822, where it was held that the statute of 43 Elizabeth, ch. 4, was not in force. In this case, the fund was given to trustees to apply the income to the maintenance and education of the poor children belonging to the congregation of St. Peter’s Protestant Episcopal Church in the city of Baltimore. The bequest was held to be indefinite and void. The court follow the case in 4 Wheat, and say, that before the statute of Elizabeth no charity could have been established where the instrument creating it was defective, or the object of the testator’s bounty so vaguely and imperfectly described as to be incapable of taking if it was not a charity. P. 400.
Á similar decision was made in Virginia, in Gallego’s executors vs. The Attorney General, 3 Leigh, 450, where it was held that the statute of Elizabeth had been repealed and that the Court of Chancery had no jurisdiction to decree charities where the objects'were indefinite and uncertain. The court follow the opinion in 4 Wheat, that there was no common law jurisdiction over devises to charitable uses prior to the statute of Elizabeth.
It must be admitted, however, that there is an irresistible *232 weight of authority in favor of the original and inherent jurisdiction of a court of chancery to sustain such charities as the one created by this will.
The conclusion then to which I have come upon this branch of the argument is, without any reference to the statute of Elizabeth, that this is a valid bequest, and that this court can, as a court of equity, by virtue of its common law powers immemorially exercised both in England and in the highest judicial tribunals in the United States, give it effect. This is not by virtue of any prerogative power, which is not claimed for this court. It is not upon the doctrine of cy pres, that if you cannot give effect to the intention of the testator and apply the fund to the charity he intended, the court will then apply it to some other charity as nearly analagous to it as possible, a doctrine which I wholly repudiate; but it is upon the simple judicial power of the court, and which it continually exercises. The executors are the trustees for the legatees entitled to the fund under the will. All that this court are required to do, is to declare the validity of the bequest, and to direct the executor to perform the trust, and to pay over to these societies, or their proper officer to receive it, that portion of the fund to which they are entitled, or to give a decree against him for the amount. There is no necessity for any scheme to be reported by the Master, in regard to the application of the fund, or the objects to which it is to be appropriated. These societies are fully competent to form a scheme for its administration. The testator was willing to intrust it to them, and so may this court be. We cannot suppose there will be a breach of trust on the part of these societies, in the management or application of the fund. If there is, when such a case occurs, it will be time enough then to investigate it, and to give relief as in other cases of breach of trust.
With the view ■ here taken of the validity of this bequest and of the power of this court to give it effect upon common law principles, it is perhaps not indispensable to enquire further, whether the statute of 43 Elizabeth, ch. 4, in regard to charitable uses, is in force in this State. But as that question is directly made here, and in one point of view would relieve *233 this case of any difficulty, if any existed, I will proceed to examine that question with as much brevity as possible. This statute of Elizabeth was enacted in 1601. • The date of the Virginia charter, which included what was afterwards called North Carolina, and since Tennessee, was 1606, and the first settlement in Virginia under Smith at Jamestown was in 1607; and it is a settled doctrine, that English statutes, passed before the emigration of -our ancestors,- which were applicable to our situation and government, constitute a part of the common law of this country, and that that common law is thé law of the land in all the States of the Union. 5 Peters, 233; 8 Pick. Rep. 309; 7 Peters’ App. 976-7; 4 Paige, 198; 1 Kent, 472-3. See too 4 Dana, 361; 1 Tenn. 154; Haywood’s Hist. of Tenn. p. 2; 2 Peere Wms. 75.
In addition to that, by express legislative enactment in North Carolina in 1778, chap. 5, (Nicholson & Caruthers, 438,) which is in force here, all such statutes and parts of the common law as' are not inconsistent with the freedom and independence of the State and our form of government, and which have not been otherwise provided for, nor abrogated or repealed, or become obsolete, are declared to be in full force within the State. These statutes are those which were passed previously to the date of the charter before referred to. 1 Tenn. 154.
Let us look then at this statute of Elizabeth and examine its provisions so far as this case is concerned. It recites in substance, that lands, tenements, rents, annuities, profits, heredita-ments, goods, chattels, money and stocks of money, had been before given, limited, appointed and assigned, by well disposed persons; “some for relief of aged, impotent and poor people, some for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars in universities; some for repair of bridges, ports, havens, causeways, ■churches, sea-banks and highways; some for education and preferment of orphans,” &c.; and that the same “had not been employed according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust, and negligence in those that should pay, deliver and employ the same.”
*234 It is then enacted that the Lord Chancellor, &c. shall appoint commissioners to enquire into all such gifts, limitations assignments and appointments, and of the abuses, breaches of trust, negligences, misemployments, &c. of such lands, goods, chattels, &c. which had before been given, limited, appointed or assigned, or which thereafter should be given, limited, appointed or assigned to or for any of the charitable or Godly uses before mentioned; and to make such orders, &c. in reference to the same,, which shall cause them to be faithfully employed to the charitable uses before mentioned; and which orders and decrees were to be returned into the Court of Chancery, and to stand good until the same shall be undone or altered by the Lord Chancellor, &c. who upon complaint of the party aggrieved, might “annul, diminish, alter or enlarge the said orders, judgments and decrees of the commissioners’* as was consistent “with equity and good conscience, according to the true intent and meaning of the donors and founders thereof.” English statutes at large, 2 vol. 708.
Now, so far as regards the main object of the act, which was the protection of the charities there mentioned, it cannot but be regarded as equally important in the Colonies, with the Mother Country, so far as they had charities which required protection — and so likewise in the State of North Carolina, after she became a State. The statute upon its face does not purport to give any new jurisdiction over charities to the Court of Chancery, which it did not before possess; but on the contrary recognizes the existing power of the court, and gives an additional remedy by the appointment of commissioners. Now, whether the Colony of North Carolina had all the officers mentioned in the act, or whether the peculiar remedy pointed out was ever followed or not, there, is wholly immaterial. The act recognizes the validity of such charities, and the jurisdiction over them of a Court of Chancery, and consequently the Court of Chancery when established in the Colony, and afterwards in the State of North Carolina, would have the right to protect such charities in any way consistent with the acknowledged powers of a Court of Chancery. It is known too as matter of history, that the Colony of North Carolina had a Court of *235 Chancery, which was established by the Lords Proprietors under the charter, which was held by the Governor and coun" cil. See 1 Hawke’s Law and Equity, 132. And in 1782, a Court of Equity was established by the State of North Carolina, with “all the power and authority that the Court of Chancery, which was formerly held in the State under the late government, used and exercised, and that are properly and rightfully incident to such a court, agreeable to the laws in force in the State, and not inconsistent with the constitution.” 1 Scott, 261. In 1794 the old Superior Court in this State was constituted with similar powers, which were continued to the Circuit Court by the act of 1809, and afterwards to the Chancery Court.
I take it, then, that this Statute of Elizabeth, must be regarded in force here, so far as any question growing out of it is involved in this cause, that is, to the extent of giving protection to charities, for in that regard it is eminently liberal, and in accordance with the spirit of our free institutions.
To proceed, then, with the statute. So far as regards the uses in the will, it is not denied that they are charitable within the statute. See 2 Story, 511-12. It only remains then, to en-quire whether the bequests are valid and protected by the statute. It is said, if the statute is in force here, that we .ought to look rather at the plain meaning of the act, than to the extravagant constructions which have been placed upon it by the English courts, and the Judges of some of our own States. It is true that these decisions are not binding upon this eourt, but at the same time I know of no reason why we should disregard the opinions of the master minds of English and American jurisprudence upon the construction of an English statute, which is in force here, to the extent indicated, when it is upon a subject upon which we have not legislated, and when upon other subjects we give their opinions the most respectful consideration.
But let us look at the act itself, not forgetting, however, the favor with which charities have always been regarded, and that the construction, therefore, upon a statute in reference to them should be a liberal one. Now, the objection here is, as before *236 remarked, that these Societies are unincorporated, and the objects of the bequest indefinite and vague. Is there any thing in the language of the act which shows that it is charities to incorporated societies, or even charities where there were competent trustees; that are alone to be protected? Certainly not. The language is very broad and general, covering all the charities mentioned in the. act, no matter how created, and having no more reference to a corporate than to an unincorporated society.' It speaks of property which had been before given, limited, appointed or assigned, or which shall be hereafter given, limited, appointed or assigned to or for any oí the charitable and godly uses before mentioned. Besides, a bare reference to the charities enumerated in the act, will show that it could not be, and never was intended to be confined to incorporated associations. As for instance, charities for the relief of aged, impotent and poor people, for maintaining sick and maimed soldiers and mariners, for the education and preferment of orphans, for free schools, for the repair of bridges, churches, &o.; most of which exclude the idea of an incorporated association for their benefit.
With regard to the other objection to the vagueness and indefiniteness of the bequest, that the beneficiaries are not designated,'nor the precise manner of the application of the fund indicated, — is this necessary under the statute? Is the charity required to be defined with technical accuracy in order to make it valid? That is not required, either by the language or the spirit of the act. From the nature of things, from the kind of charities to be protected, they must be to some extent vague and indefinite. Suppose the charity was for the education and preferment of orphans, how could they be designated in the will? It is for a free school, or school of learning — why require anything more? The statute does not. And would not the attempt at specification under the circumstances in which wills are usually made, defeat the very object they were intended to advance? Is it to a missionary society, the object of whose labors, is the spread of the Gospel bv means of missionary schools and missions, printing books for the benefit of those schools, &c., which is within the acknowledged equity of the *237 statute? Why require any further specification, and which it would be impracticable to make? The effect of the argument would be to destroy all charities, unless drawn with technical precision and accuracy, which is rarely to be expected in a last will and testament. It seems to me this objection cannot now be successfully urged. If these Societies are competent to take and administer this charity, and if the uses are charitable within the statute, this court can enquire no further, unless upon some case of misapplication of that charity, upon which it might be called upon to interfere, which is not the case here. I take it, then, if this court were now, for the first time, to adjudicate upon this statute, that these bequests would be regarded as valid, and be sustained by the court.
But it is time to refer to some of the decisions under this statute. In the case before referred to of The Philadelphia, Baptist Association vs. Hart's Ex'rs, 4 Wheat. 1, the Chief Justice admits, p. 29, that that is a legacy which would be sustained in England under the statute of Elizabeth. It is very certain, that gifts to unincorporated societies were good and protected by the act. In the case of Waller vs. Childs, Ambler, 524, the fund was for the benefit of poor dissenting ministers, to be paid to the Treasurer of the Societies. A bill was filed by the heir at law, to set aside the charitable bequests. It was held, that the bequests were good. The case of Baylis and Church vs. The Attorney General, 2 Atk. 239, is the case of a bequest to the Aldermen and inhabitants of a ward, who were not a corporation. Lord Chancellor Hardwicke decreed, that the money might, from time to time, be disposed of in such charities as the Aldermen, for the time being, and the principal inhabitants should think most beneficial to the ward. Story recognizes it as a settled principle, that a bequest to an unincorporated society is good. 2 Story’s Eq. Juris. 515.
In Attorney General vs. Clark, Ambler, 422, George Cranstown, by will, gave the interest of ¿£4,200 bank annuities to the poor inhabitants of St. Leonard, Shoreditch. A bill was filed to establish the charity. It was insisted that the bequest was void for uncertainty, but it was sustained by Sir Thomas Clarke, Master of the Rolls. In White vs. White, 7 Ves. 423, *238 thetestatrix, by her will, bequeathed a personal fund of ¿63,000 for the purpose of putting out “poor relations” apprentices, and afterwards, by a codicil, she confined it to two families. Upon a bill filed to carry into execution the trusts of the will, it was sustained by Sir William Grant, Master of the Rolls, as a valid charity. In Powell vs. The Attorney General, 3 Merivale, 48, a bequest “to the widows and children of seamen belonging to the town of Liverpool,” was held to be a valid charitable bequest.
In Attorney General vs. Hickman, 2 Eq. Cas. Abr. 193, the testator, by a codicil to his will, devised the residue of his estate and effects to be given to such non-conforming ministers as preached God’s word in places where the people are not able to allow them sufficient maintenance, and appointed two persons to have the disposal and appointment of the charity, who died in the life time of the testator. One question was, whether the trustees having died in the life time of the testator, the charity was not gone, and in the nature of a lapsed legacy. It was decided by the Chancellor, Lord King, that the substance of the charity remained, notwithstanding the death of the trustees before the testator, and though at law it was a lapsed legacy, yet in equity it subsisted and was good within the statute of Elizabeth.
Tt is likewise a principle, that the court will in aid of charities supply all defects of conveyances, when the donor hath a capacity and a disposable estate, and his mode of donation does not contravene the provisions of any statute. 2 Story, 518.
In Attorney General vs. Comber, 2 Sim. & Stu. 93, a bequest to the widows and orphans of the Parish of Lindfield, was held to be a good charitable bequest. The Attorney General vs. Stepney, 10 Ves. 22, was a bequest for the use of the Welsh Charity School, and the increase and improvement of Christian knowledge and promoting religion, and to purchase Bibles and other religious books, pamphlets and tracts as the trustees should think fit, which was sustained. See too Moggridge vs. Thackwell, 7 Ves. 36: Mills vs. Farmer, 1 Merivale, 55, and Attorney General vs. Bishop of Chester, 1 Br. Ch. Cas. 444. *239 Cases might be multiplied indefinitely, from the English courts to show, that charities, much more vague and indefinite than the present, would be sustained in England, under the ordinary, acknowledged, judicial powers of a court of equity.
The cases to which we have been referred, that of Morrice vs. Bishop of Durham, 9 Ves. 399: Vesey vs. Jamson, 1 Sim. & Stu. 69: and Williams vs. Kershaw, cited 1 Keen R. 232: 2 Story, 505, which have not been sustained by a Court of Chancery, are not analogous to the present. They were for objects of general benevolence and liberality, and not within the class of cases enumerated in the Statute of Elizabeth, nor within its spirit and meaning, and too indefinite to be executed.’
But it is insisted, that although this charity might be enforced in England, yet it would not be upon the ordinary jurisdiction of a Court of Equity, but upon the personal and prerogative powers of the Chancellor, as the delegate and representative of the Crown, and which powers do not belong to the Chancery Court here. By statute, as before shown, our court of chancery has all the powers which properly and rightfully belong to such a court, and which are not inconsistent with our constitution and laws. And its powers are no doubt as ample as that of the chancery court in England, with no other difference except that which grows out of the difference of our institutions. We have assumed jurisdiction to the fullest extent in all other cases of trust, to protect them and to secure their due execution, and when there has been a refusal or failure on the part of the trustee to execute the trust, this court has executed it. 3 Hump. 251, 442. See too 2 Hump. 367: 3 Yerg. 257: 9 Do. 171. Why shall we stop short in reference to charities, which appeal so strongly to the support of the judiciary? A charity is nothing but a trust, but, as before remarked, the most highly favored of all trusts, being generally for purposes of education or religion. There are no doubt many cases to be found in the English courts, where the Chancellor is regarded as the special delegate of the Crown, administering its peculiar duties and prerogatives. As for instance, where money is given to charity generally and indefinitely, without any particular object designated, or any one appointed to administer it. *240 There the disposition and administration of it are in the King by his sign manual, acting through the Chancellor. See 2 Story, 536: 3 Peters, 499: 7 Vermont, 305. And so when the proceeding is by commission under the Statute of Elizabeth, as in the case of The Corporation of Burford vs. Lethall, 2 Atk. 551, the authority which the Lord Chancellor exercises, is said to be personal, aird not to arise by virtue either of his ordinary or extraordinary jurisdiction in chancery. But that does not affect the argument here, if it has been shown that this is a good and available trust, and a charity that would be protected, either according to the principles of the common law, or under the Statute of Elizabeth. It is then as properly the subject for a court of chancery, and for the exercise of judicial power as any other trust. And such has been the universal opinion both in England and in the United States. See 3 Peters, 499: 4 Dana, 368.
In whatever aspect, therefore, I have been enabled to examine this question, I regard the bequests contained in the will as valid, and that they should be sustained by this court.
As it regards the division of the fund between the Tennessee Annual Conference of the Methodist Episcopal Church, and the Missionary Society of the Methodist Episcopal Church, «quality in such a case would be equity, and there must be an equal division of the fund between them. Attorney General vs. Doyley, 7 Ves. 58, note: 10 Do. 538: 6 Paige, 653.
In my opinion, the decree of the Chancellor should be reversed, the demurrer overruled, and the cause remanded for further proceedings.